James E. STANSBURY, Defendant Below, Appellant,

v.

STATE of Delaware, Plaintiff Below, Appellee.

Supreme Court of Delaware.

Submitted: Jan. 23, 1991.
Decided: April 19, 1991.

Sheryl Rush-Milstead (argued), Wilmington, for appellant.

Steven P. Wood (argued), Deputy Atty. Gen., Dept. of Justice, Wilmington, for appellee.

Before HORSEY, WALSH and HOLLAND, JJ.

WALSH, Justice:

The defendant, James E. Stansbury ("Stansbury"), was charged with Murder First Degree and two counts of Possession of a Deadly Weapon During the Commission of a Felony as a result of the June 10, 1988 slaying of a young woman. Following a jury trial in Superior Court, Stansbury was convicted of all charges and received a mandatory life sentence on the murder charge and five years on each of the weapons offenses. In this appeal, Stansbury raises two claims of error. First, he argues that the trial court committed plain error by failing to instruct the jury on the verdict of "guilty, but mentally ill." Second, he contends the trial court erred in ruling, as a matter of law, that a bowling ball and a barbell are "deadly weapons."

After a review of Stansbury's claims, we conclude the evidence presented at trial did not warrant an instruction to the jury on the verdict of "guilty, but mentally ill." However, the trial court did err in determining that a bowling ball and a barbell are deadly weapons. Accordingly, we affirm Stansbury's murder conviction, but reverse his conviction on the two weapons offenses.

I

Testimony at trial indicates the following events took place on June 10, 1988. The partially-clothed body of the victim, Kimberly Watson ("Watson"), was found in the alley behind her Wilmington residence. Near Watson's body was a blood-soaked sleeping bag which contained a three-pound barbell covered in blood. In the basement of the victim's residence, the police found blood splattered on the walls and a blood-stained bowling ball. Based on this evidence, they determined the murder took place in the basement, and Watson's body

was then moved to the alley. An autopsy of Watson revealed that she was killed by strangulation and by blunt force trauma to the head. The autopsy further revealed that these injuries were consistent with having been caused by both the barbell and the bowling ball.

In the process of investigating the murder, the police questioned the defendant, Stansbury, who was a housemate of the victim. Initially, Stansbury was not a suspect. Later, however, he admitted that he was motivated by "voices" which told him to "seek and destroy." He also stated that "the voice told me to kill her so I killed her." On June 21, 1988, Stansbury was reinterviewed, at his request, by the Wilmington Police. During the course of this interview, Stansbury denied taking part in the murder. He claimed that the crime was perpetrated by two drug dealers from Chester, Pennsylvania who, after killing Watson, forced him to carry the body to the alley.

At trial, Stansbury's defense was "not guilty by reason of insanity." In support of his defense, he called one witness, Dr. Irving G. Weintraub, a psychologist. Dr. Weintraub testified that he believed Stansbury suffered from either paranoid schizophrenia or schizophreniform.[1] Dr. Weintraub also stated that under stress Stansbury's psychosis would prevent him from "appreciating the wrongfulness of his behavior," although it was impossible to determine his mental state at the exact moment of the crime.

To rebut the testimony of Dr. Weintraub, the State presented David Raskin, M.D., a forensic psychiatrist. Dr. Raskin concluded that there was "no question" Stansbury had the capacity to understand that murder is a wrongful act. Dr. Raskin also attributed the symptoms observed by Dr. Weintraub to malingering by Stansbury. He

further stated that even if he assumed that Stansbury did, in fact, hear "voices," that phenomenon did not affect his ability to distinguish between right and wrong. Finally, Dr. Raskin disputed Dr. Weintraub's conclusion that Stansbury suffered from schizophreniform. In sum, Dr. Raskin was of the view that Stansbury was not mentally ill.

Prior to closing arguments, the trial judge asked Stansbury's counsel whether she wanted the court to give a "guilty, but mentally ill" instruction. Counsel stated she did not. As a result, the judge instructed the jury concerning three possible verdicts: "guilty," "not guilty" or "not guilty by reason of insanity." Prior to rendering its verdict, the jury sent a note to the trial judge asking whether it could "include a recommendation for mental assistance" with its verdict. The trial judge instructed the jury to limit their response to returning a verdict. The jury found Stansbury guilty as charged, and this appeal followed.

## II

Stansbury's first claim on appeal is that the trial court committed plain error by failing to instruct the jury on the verdict of "guilty, but mentally ill." Stansbury argues that the testimony of Dr. Weintraub fully supported either a verdict of "not guilty by reason of insanity" or "guilty, but mentally ill," and thus, the court was required, pursuant to 11 *Del.C.* § 3905[2] and this Court's decision in *Daniels v. State*, Del.Supr., 538 A.2d 1104 (1988), to instruct the jury on both verdicts. We disagree. The trial court was not required to instruct the jury on the verdict of "guilty, but mentally ill" because the testimony presented at trial did not warrant such an instruction.

---

1. Schizophrenia is a psychosis which impairs an individual's ability to think realistically. Schizophreniform, on the other hand, is a temporary episode of mental illness.

2. 11 *Del.C.* § 3905 provides:

At the conclusion of a trial under this title, where warranted by the evidence, the charge to the jury shall contain instructions that shall

consider separately the issues of guilt and the presence or absence of insanity, and shall also contain instructions as to the verdicts of 'guilty'; 'guilty, but mentally ill'; 'not guilty by reason of insanity'; and 'not guilty' with regard to the offense or offenses charged and, as required by law, any lesser included offenses.

■ Stansbury failed to object to the jury instructions at trial. Furthermore, his counsel specifically requested that the "guilty, but mentally ill" instruction not be given. In general, this Court will decline to review any issue not raised and fairly presented to the trial court for decision. *Probst v. State*, Del.Supr., 547 A.2d 114, 119 (1988); Supr.Ct.R. 8. However, where substantial rights are jeopardized and the fairness of the trial imperiled, this Court will apply a plain error standard of review. *See Wainwright v. State*, Del.Supr., 504 A.2d 1096, 1100 (1986).[3] Therefore, we must determine whether the trial court's failure to instruct the jury on the verdict of "guilty, but mentally ill" affected substantial rights of the defendant.

The Delaware Criminal Code provides two defenses to criminal conduct based on a defendant's mental illness. First is the plea or verdict of "not guilty by reason of insanity." 11 *Del.C.* § 401(a).[4] Section 401(a) provides that if a jury determines a defendant lacked the substantial capacity to appreciate the wrongfulness of his conduct, it shall find him "not guilty by reason of insanity." This section is premised upon the belief that an individual who does not know his conduct is wrongful should not be punished as a result of that conduct. *See Sanders v. State*, Del.Supr., 585 A.2d 117, 126 (1990).

A second plea or verdict arising from mental illness is "guilty, but mentally ill." 11 *Del.C.* § 401(b).[5] Section 401(b) provides that a defendant who lacks sufficient willpower to choose whether to act or refrain from acting shall be "guilty, but men-

tally ill." This provision reflects legislative recognition that some defendants, while able to appreciate that their conduct is wrong, are unable to refrain from engaging in that conduct. *See Daniels*, 538 A.2d at 1107–8. The Delaware General Assembly has determined that these individuals deserve both treatment and punishment. *See* 11 *Del.C.* § 408. Accordingly, the statute authorizes commitment for treatment at the Delaware State Hospital. Upon release, however, the defendant is required to serve the remainder of his sentence in the custody of the Department of Correction. *Sanders*, 585 A.2d at 127.

■ Counsel is empowered to make tactical decisions at trial. *See Strickland v. Washington*, 466 U.S. 668, 690, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984). The decision to pursue a particular defense and eschew another is usually based on informed strategic choices. *Id.* at 691, 104 S.Ct. at 2066. Here, counsel's decision to pursue a defense based on insanity and avc·d the defense of "guilty, but mentally ill" is such a choice and finds logical explanation. Stansbury was charged with First Degree Murder but did not face the possibility of receiving the death penalty because the State alleged no aggravating circumstances as required by 11 *Del.C.* § 4209(e). If convicted, the maximum sentence Stansbury could receive is life in prison "without benefit of probation or parole or any other reduction." 11 *Del.C.* § 4209(a). If Stansbury were found "guilty, but mentally ill" he could receive the same sentence as if he were found "guilty," but he would be confined to the

---

**3.** The State has suggested the application of the so-called invited error doctrine under which a defendant cannot complain of an error which he invited upon himself. *See United States v. Taylor*, 10th Cir., 828 F.2d 630, 633 (1987). We have, however, determined that Stansbury's claim is more properly analyzed under a plain error standard of review.

**4.** 11 *Del.C.* § 401(a) provides:
In any prosecution for an offense, it is an affirmative defense that, at the time of the conduct charged, as a result of mental illness or mental defect, the accused lacked substantial capacity to appreciate the wrongfulness of his conduct. If the defendant prevails in es-

tablishing the affirmative defense provided in this subsection, the trier of fact shall return a verdict of 'not guilty by reason of insanity.'

**5.** 11 *Del.C.* § 401(b) provides:
Where the trier of fact determines that, at the time of the conduct charged, a defendant suffered from a psychiatric disorder which substantially disturbed such person's thinking, feeling or behavior and/or that such psychiatric disorder left such person with insufficient willpower to choose whether he would do the act or refrain from doing it, although physically capable, the trier of fact shall return a verdict of 'guilty, but mentally ill.'

Delaware State Hospital until it was determined that discharge was in his best interest. At that time, he would be returned to the Department of Corrections to serve the remainder of his sentence. 11 *Del.C.* §§ 408(b) & (c); *See Sanders*, 585 A.2d at 124–25. Thus, Stansbury's counsel clearly realized that the only benefit to be gained by a verdict of "guilty, but mentally ill" was that Stansbury would begin his sentence in the Delaware State Hospital. Therefore, she focused her efforts on proving Stansbury did not appreciate the wrongfulness of his conduct.

Stansbury argues that 11 *Del.C.* § 3905 and this Court's decision in *Daniels* require a trial judge to give a "guilty, but mentally ill" instruction despite the defendant's explicit rejection of such an instruction. We find, however, that *Daniels* is clearly distinguishable from the present case. In *Daniels*, the defendant appealed his "guilty, but mentally ill" conviction claiming that it was improper for the trial judge to so instruct the jury at the request of the State. We held that 11 *Del.C.* § 3905 requires a judge to give a "guilty, but mentally ill" instruction "where warranted by the evidence regardless of whether the defendant requests it." *Daniels*, 538 A.2d at 1111. Thus, if a proper foundation exists in the evidence, the trial judge must give the instruction if either the defense or the prosecution requests it.

The testimony of the defendant's expert medical witness in *Daniels* warranted an instruction to the jury concerning a possible verdict of "guilty, but mentally ill." In order to establish a verdict of "guilty, but mentally ill," Delaware law "requires the jury to find that at the time of the offense, the defendant: (1) suffers from a psychiatric disorder; and (2) the disorder leaves the defendant with insufficient willpower to choose whether he would do an act or refrain from doing it." *Daniels*, 538 A.2d at 1112. In *Daniels*, it was clearly established the defendant had a psychiatric disorder. On cross-examination, a defense psychiatrist stated that Daniels acted "impulsively" and "automatically," testimony which supported a verdict of "guilty, but mentally ill." *Id.* Thus, a factual predicate of mental illness was presented and

plainly warranted an instruction on the verdict of "guilty, but mentally ill."

The evidence presented in the present case did not support an instruction on the verdict of "guilty, but mentally ill." The testimony at trial established that Stansbury may have suffered from some type of psychiatric disorder, but there was no evidence presented which established that Stansbury's mental illness deprived him of the willpower to act or refrain from acting. Stansbury's counsel carefully and deliberately elicited testimony from Dr. Weintraub which supported a verdict of "not guilty by reason of insanity." On direct examination, Dr. Weintraub testified that Stansbury did not appreciate the wrongfulness of his conduct. Stansbury's counsel did not inquire as to Stansbury's ability to act or refrain from acting or whether Stansbury's acts were "impulsive" or "automatic."

The decision to have the jury instructed on the verdicts of "guilty," "not guilty" and "not guilty by reason of insanity" is a clear manifestation of the tactical choice made by Stansbury and his counsel to eschew a verdict of "guilty, but mentally ill." They perceived no practical difference between a verdict of "guilty" and a verdict of "guilty, but mentally ill." In furtherance of that decision, the defense presented no testimony supporting a verdict of "guilty, but mentally ill," and the evidence did not otherwise warrant such an instruction. The trial court was not required, *sua sponte*, to provide the jury with an instruction not supported by the evidence and expressly rejected by Stansbury's counsel.

Stansbury argues that the significance of the court's error in failing to give the statutorily mandated "guilty, but mentally ill" instruction is illustrated by the note from the jury inquiring about their ability to recommend treatment. Prior to delivering their verdict, the jury sent a note to the trial judge. This note stated: "[T]he jury has reached a decision, however, all of us would like to know if we may include a recommendation for mental assistance with our verdicts." This inquiry by the jury, while indicative of the jury's concern for the defendant's mental state as reflected in his violent conduct, has no significance in

the absence of appropriate instructions concerning the meaning of a "guilty, but mentally ill" verdict. Since there was no factual or legal basis for the giving of such an instruction, the jury's inquiry was directed to a concern which was beyond their prerogatives, as the trial judge specifically advised them.

In sum, we find the trial court's failure, *sua sponte*, to instruct the jury on the verdict of "guilty, but mentally ill" did not affect substantial rights of the defendant. Thus, we reject Stansbury's claim of error.

### III

Stansbury's second claim on appeal is that the trial court, in a post-trial ruling directed to his motion for judgment of acquittal, erred in determining that a bowling ball and barbell are deadly weapons.

The term "deadly weapon" is defined at 11 *Del.C.* § 222(5). This section lists a variety of items which the legislature has deemed to be deadly weapons.[6] This list is not intended to be exhaustive, and is designed merely to list those "objects generally known to be used in causing death." *Pauls v. State*, Del.Supr., 476 A.2d 157, 160 (1984). Deadly weapon has been held to include "the classic instrumentalities of violence and their home-made equivalents." *Id.* (quoting *People v. Grubb*, Cal.Supr., 63 Cal.2d 614, 47 Cal.Rptr. 772, 408 P.2d 100 (1966) (en banc)).

A "dangerous instrument," on the other hand, is defined as "any instrument, article or substance which, under the circumstances in which it is used, ... is readily capable of causing death or serious physical injury." 11 *Del.C.* § 222(4).[7] "It is clear that a 'dangerous instrument' may also be a deadly weapon, and the fact that something is a dangerous instrument does not prevent it from being also a 'deadly weapon.'" *Pauls*, 476 A.2d at 159–60.

In *Pauls*, this Court held that a broken bottle and a club formed from the bottom half of a crutch were deadly weapons. 476 A.2d at 160. The broken bottle was determined to be a deadly weapon because of its similarity to those items listed in the statutory definition of deadly weapons. The club fashioned from a crutch was regarded by the Court as a homemade "bludgeon," a term also listed under the statutory definition of deadly weapon.

■ We find the barbell and the bowling ball used by Stansbury to murder Watson are items of common usage, and while they may become deadly instrumentalities, they are not deadly weapons. Moreover, they are not among the items listed in the statute, nor do they bear any similarity to these items. Unlike the broken bottle and the club in *Pauls*, these items were used in their unaltered form, and their mere use to commit murder does not permit their classification as deadly weapons.[8] Thus, they are clearly distinguishable from those items listed as deadly weapons. Accordingly, the trial court erred in determining that a bowling ball and a barbell are deadly weapons.

\*     \*     \*     \*     \*     \*

---

6.   11 *Del.C.* § 222(5) provides:

    "Deadly weapon" includes any weapon from which a shot may be discharged, a knife of any sort (other than an ordinary pocketknife carried in a closed position), switchblade knife, billy, blackjack, bludgeon, metal knuckles, slingshot, razor, bicycle chain or ice pick. For the purpose of this definition, an ordinary pocketknife shall be a folding knife having a blade not more than 3 inches in length.

7.   11 *Del.C.* § 222(4) provides:

    "Dangerous instrument" means any instrument, article or substance which, under the circumstances in which it is used, attempted to be used or threatened to be used, is readily capable of causing death or serious physical injury.

8.   The State has urged this Court to expand the definition of deadly weapon to include any item "capable of causing death." *Pauls*, 476 A.2d at 160. We believe, however, that an expansion of the definition of deadly weapon would lead to undesirable enforcement and interpretation problems. Specifically, 11 *Del.C.* § 1447 imposes severe penalties for the possession of a deadly weapon during the commission of a felony. *See Gardner v. State*, Del.Supr., 567 A.2d 404, 413 (1989). A defendant is deemed to possess a deadly weapon if it is "physically available or accessible to him." *Id.* (quoting *Mack v. State*, Del.Supr., 312 A.2d 319, 322 (1973)). If the State's definition were adopted, a defendant could be convicted of possession of a deadly weapon during the commission of a felony and subject to the severe penalties associated with this section for merely having an item capable of causing death available to him when he com-

The judgment of the Superior Court is AFFIRMED in part and REVERSED in part and REMANDED for resentencing as to the weapons offenses.

mitted a felony. For example, a defendant who committed a robbery while carrying a bowling ball could be guilty of violating section 1447. We find this result to be wholly inconsistent with the "purpose of [§ 1447] ... to discourage the *accessibility* of a deadly weapon during the commission of a crime, thus reducing the probability of serious harm to the victim." *Mack*, 312 A.2d at 322.

