**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

STATE OF DELAWARE,       )
                            )
     v.                   )      I.D. No. 2105010115
                            )
GEORGE F. SMITH, III,       )
                            )
     Defendant.          )

Submitted: April 25, 2025
Decided: June 10, 2025

**ORDER**

The above matter exposed facts to a jury that were truly tragic.

George Smith ("Defendant" or "Mr. Smith") suffered the loss of his father shortly before the incident giving rise to the charges. His father owned an extremely fast automobile – a Dodge "Hellcat." For reasons unknown, the Defendant took the Hellcat out onto I-495 northbound late one night and drove it at extreme speeds as it crossed the 406 bridge over the Christina River and onto a long straightaway.

At speeds in excess of 140 miles an hour, he plowed into the rear of a woman driving at normal speed on I-495. There was no evidence that he ever hit the brakes. The woman's car left the roadway, rolled several times and caught fire, killing the sole occupant. Mr. Smith's car stayed on the roadway, its front end demolished. He survived with minor injuries.

After the accident, the usual testing revealed no alcohol or drugs in Smith's system. He expressed to the police only a vague understanding of what happened. He did express deep concern whether anyone had been injured.

The State indicted Mr. Smith on charges of Murder, Second Degree – recklessly causing death with a "cruel, wicked and depraved" state of mind – and Possession of a Deadly Weapon (to wit – a car) during commission of a felony (to wit – Murder Second Degree). After a trial and due deliberations, the jury convicted the Defendant on both counts.

Defense Counsel has filed post-trial motions for a new trial and a separate motion for judgment of acquittal. These motions will be dealt with by this Order.

**STANDARD OF REVIEW**

A post-trial motion for a new trial is governed by Rule 33, which empowers the trial court to grant a new trial at defendant's request if it is "in the interest of justice"[1] to do so. The Defendant is entitled to a new trial "only if the error complained of resulted in actual prejudice or so infringed upon a defendant's fundamental right to a fair trial as to raise a presumption of innocence."[2] It is to be noted that none of the claims made here are unique to this motion: all of them were made before or during the trial, all were considered, and all have previously been

---

[1] Super. Ct. Crim. R. 33.

[2] *Hughes v. State*, 490 A.2d 1034, 1043 (Del. 1985).

ruled on by the Court. Likewise, it is to be noted that a review in the "interest of justice" is not an invitation for the Court to substitute its judgment of the facts for the jury's verdict.[3]

Motions for judgment of acquittal are controlled by Rule 29, which allows such motions when the evidence presented "is insufficient to sustain a conviction of such offense or offenses."[4]

## ANALYSIS

### I.     The Motion for a New Trial

The Court begins this analysis by recognizing the obvious: the only "real" issue in this case was whether the Defendant's conduct was "merely" reckless, thus meriting a conviction for manslaughter, or was aggravated beyond reckless, albeit short of intentional conduct. From the opening statements, Defendant essentially conceded his guilt to manslaughter. So the inevitable jury debate was always going to be whether Defendant's conviction would be for manslaughter or whether the manslaughter was elevated to Murder Second Degree. In this connection, the Court

---

[3] *See United States v. Vastardis*, 448 F. Supp. 3d 391, 395 (D. Del. 2020), *aff'd*, 19 F.4th 573 (3d Cir. 2021), and *aff'd sub nom. United States v. Evridiki Navigation Inc.*, 2023 WL 3734961 (3d Cir. May 31, 2023) (quoting *United States v. Silveus*, 542 F.3d 993, 1004-05 (3d Cir. 2008)) (held the court should not replace its judgment for the jury's verdict on the facts, unless "there is a serious danger that a miscarriage of justice has occurred – that is, that an innocent person has been convicted.").

[4] Super. Ct. Crim. R. 29(a).

asked for input from both counsel as to how to approach the aggravating terms in the jury instructions.

### A. The Jury Instructions

After briefing from both sides, the Court was not convinced that it should depart from the standard, pattern jury instructions, which provide admittedly somewhat truncated definitions of these terms. The hazard is, and remains, that by varying the standard instruction for some perceived "un-standard" case, there is the risk of substituting the Court's interpretation over the "common, ordinary" meaning intended by the legislature.[5] The standard Murder 2d degree instruction has been given in innumerable cases and has withstood appellate scrutiny.[6] Going "free-style" has not.

The Court told the jury that undefined terms (such as "cruel, wicked and depraved") have their common meaning. In *State v. Waters*,[7] the Supreme Court faulted the trial court's failure to even attempt to define these "common meaning" terms, thus running afoul of the vagueness problem that was then swirling around

---

[5] *See Peak v. State*, 734 A.2d 159, 159 (Del. 1999) ("Moreover, the adoption of pattern jury instructions represents an institutional consensus by the Superior Court that these instructions should be followed in all cases unless unusual circumstances dictate modification."); *see also Andrews v. State*, 34 A.3d 1061, 1063 (Del. 2011) (citing *Duncan v. State*, 791 A.2d 750, 750 (Del. 2002)) ("Undefined words in the criminal code are to be given their "commonly accepted meaning, unless they are specifically defined elsewhere in Title 11.").

[6] *See, e.g.*, *McKinley v. State*, 945 A.2d 1158, 1162-63 (Del. 2008).

[7] 443 A.2d 500, 504 (Del. 1982).

4

the criminal law in the form of the Capital Punishment Statute, prohibiting murders that were "outrageously or wantonly vile, horrible and inhuman."[8] Thus, trial courts were admonished to come up with some definition of "cruel wicked and depraved" that fit within the term "common ordinary meaning."[9]

To meet the mandate of *State v. Waters*, the Superior Court pattern jury instruction defines these "common ordinary" terms as follows:

> "'Cruel' describes the malicious infliction of physical suffering upon a human being."[10]
>
> "'Wicked' describes a lack of conscience or morality."[11]
>
> "'Depraved' describes an indifference for human life."[12]

These definitions are not new and not remarkable. They are the standard instructions. If they are so erroneous as to require a new trial "in the interest of justice," then one supposes all Murder Second convictions over the past many years are equally vulnerable. The Court believes the instructions are not erroneous, which is why they were given. If they were wrong, the Supreme Court will tell us so, in

---

[8] *See Godfrey v. Georgia*, 446 U.S. 420, 426-27 (1980).

[9] *Waters v. State*, 443 A.2d 500, 506 (Del. 1982) (held it was plain and reversible error for the Superior Court to refrain from providing the jury with a definition of "cruel, wicked and depraved indifference to human life").

[10] Pattern Crim. Jury Instructions of the Sup. Ct. of the State of Del. at 264.

[11] *Id.* at 265.

[12] *Id.* at 265.

their time. The Court finds nothing in giving the pattern instruction that requires a new trial in the "interest of justice."

Defendants second argument, which is really just a variant of the first, is that the term "depraved" was not sufficiently defined for the jury. While pointing to juror confusion over the meaning of the terms, he confuses the jury confusion.

The jury did ask for clarification, focused, predictably, on the cruel, wicked and depraved elements for Murder 2d degree. The Court used the standard definition of "cruel" as the "malicious infliction of suffering,"[13] but did not define "malicious." When the jury requested it, the Court gave the jury 3 dictionary definitions of the term "malicious" and returned them to deliberate.[14]

Thereafter, the jury asked if they should focus on "the actions, the mindset, or both when we are looking at the definition for cruel?"[15] In the same note, the jury asked, "Can we have one concise definition for 'malicious?' The current definitions provided all conflict with one another and cause more confusion."[16]

---

[13] *Id.* at 264.

[14] Court's Ex. 5 (Dec. 6, 2024).

[15] Court's Ex. 6 (Dec. 6, 2024).

[16] *Id.*

6

In response, the Court elected not to further define terms not defined by the legislature.  Rather, the Court admonished the jury to determine whether these facts "fit" with a definition of "malicious" upon which they can all agree.

Defendant argues the Court left the jury without assistance in defining "depraved."  Actually, the jury never asked for assistance in defining "depraved." The Court cannot speculate on what it would have done had the jury done so.

The essential question on a motion for new trial is whether an error in the trial must be remedied by granting a new trial "in the interest of justice."  With full recognition that the exact nature of what aggravates a reckless homicide to a murder second degree is difficult, the Court does not find any manifest injustice in the record leading to the jury's conclusion.

## B. Evidentiary Rulings

The third complaint involves the Defendant's efforts to get evidence of his state of mind in front of the jury without subjecting him to the perils of cross examination.  He made statements to a police officer at the scene indicating his concerns whether anyone had been hurt in the accident.  The Court made a ruling that three of statements would be admitted under Rule 803(3) as they were statements of his "then existing mental or emotional condition."  After the ruling, defense counsel announced he had overlooked a fourth statement he wanted admitted.  The Court, in its discretion, decided the that fourth statement was merely

a repetition of the first three and was cumulative. That was not an abuse of discretion and does not mandate a new trial in the interest of justice.

The fourth complaint is a different statement by the Defendant he wanted introduced, again without facing cross examination. This statement occurred days later, when he visited the tow yard and saw the two cars that were involved in the collision. He was with his mother and a police officer. He was emotionally upset and asked the officer "will God ever forgive me?" Unlike his crime scene statements, his mental state 5 days later was not relevant and his statement was ruled inadmissible under Rule 803(3). The Court ruled that it would allow testimony to the effect that the Defendant was upset but would not allow specific, uncross examined statements to be admitted. The Court believes those rulings were correct. If they were not, the Court is certain the folks across the street will so advise; but this Court does not agree that any error was so unfair as to require a new trial in the interest of justice.

## II. The Motion for Judgment of Acquittal regarding the automobile as a weapon

The Defendant has filed a separate motion for judgment of acquittal with respect to the indictment and conviction of Possession of a Deadly Weapon During Commission of a Felony ("PDWCDF"). So we are clear, the State takes the position that when an automobile is the instrument by which the Defendant commits a felonious act, he is also guilty of the secondary offense of PDWDCF. And it will be

8

lost on nobody that the secondary offense carries an additional mandatory sentence of two years added two whatever penal consequences flow from the primary felony. Thus, the additional charge increases the State's leverage against the Defendant and has a substantial "real world" effect.

A "deadly weapon" under the Model Penal Code was defined to include guns, knives, bludgeons and the usual things we think of as "weapons."[17] Before 1992, these implements could be distinguished from a separately defined category called "dangerous instruments." Dangerous instruments included "any instrument, article, or substance which, under the circumstances in which it is used, attempted to be used, or threatened to be used, is readily capable of causing death or serious physical injury."[18] Notably, there was no crime carrying a mandatory sentence called "possession of a dangerous instrument during commission of a felony." Were we analyzing Defendant's claim prior to 1992, the claim would have merit, for the automobile in question was surely "used" to cause the injury, but it is not a typical "weapon" in that it has many pro social, non-lethal uses.

But in 1992, the General Assembly changed all that. In its synopsis of the change, the legislature said "In the recent past, a number of brutal murders and

---

[17] 11 *Del. C.* § 222(6)(a).

[18] 11 *Del. C.* § 222(5)(a).

9

assaults have been committed with common objects such as bowling balls,[19] baseball bats,[20] ratchet bars from tire jacks,[21] and cast-iron kitchen sinks[22].”[23] In order to bring these instruments within the mandatory sentencing provisions of PDWDCF, the legislature amended the definition of “deadly weapon” to include any “dangerous instrument” “which is used, or attempted to be used, to cause death or serious physical injury.”  Put differently, dangerous instruments became deadly weapons – and within the mandatory sentencing scheme for PDWDCF – whenever they caused injury.[24]

Defendant's argument here accuses the prosecution of “overreach” in including a motor vehicle as a “deadly weapon.”  He cites the Court the Supreme Court's decision in *State v. Stansbury*[25] – a case involving a homicide by a barbell

---

[19] *See State v. Stansbury*, 591 A.2d 188, 193 (Del. 1991).

[20] *See State v. Anderson*, 616 A.2d 1214, 1214 (Del. 1992).

[21] *See Walls v. State*, 560 A.2d 1038, 1048 n.16 (Del. 1989).

[22] *See Outten v. State,* 650 A.2d 1291, 1294-95 (Del. 1994).

[23] Synopsis, S.B. 420 § 3, 1992, 136th Gen. Assemb. (Del. June 1, 1992).

[24] If there was any doubt that the law's drafters were actively seeking to expand the class of cases subject to mandatory sentences, it is resolved by section 3 of the bill, which expanded the definition of “firearm” to any firearm, whether “loaded or unloaded.”  Thus, any would be gun-point robber would no longer benefit from carrying an empty pistol – he might has well carry a loaded one as the mandatory PFDCF sentence was thereafter the same either way. *See* S.B. 420 § 3, 1992, 136th Gen. Assemb. (Del. 1992).

[25] 591 A.2d 188 (Del. 1991).

and a bowling ball. The Supreme Court reversed the weapons offense convictions due to their not being "classic instrumentalities of crime."[26] Unfortunately, however unassailable that logic may have been in 1991, it was "overruled" by the legislature in 1992 – indeed, emphatically so as homicide by "bowling ball" was referenced specifically in the synopsis in 1992.[27] Thus, whether the prosecutor's charge here was "overreach" or merely "reach," a motion for judgment of acquittal cannot be sustained on that basis and the motion must therefore be **DENIED**.

  **IT IS SO ORDERED.**

        **/s/ Charles E. Butler**   
        Charles E. Butler, Resident Judge

Cc: Prothonotary
   Barzilai K. Axelrod, Deputy Attorney General
   Kristina G. Bensley, Deputy Attorney General
   Joseph A. Hurley, Esquire

---

[26] *Id* at 193. The Supreme Court was acutely aware that expanding the definition of "deadly weapon" to include any instrument used to commit harm would bring the mandatory sentencing provisions of PDWDCF into play. *Id* n.8.

[27] Synopsis, S.B. 420 § 3, 1992, 136th Gen. Assemb. (Del. June 1, 1992); *see also Clark v. State*, 184 A.3d 1292, 1292 (Del. 2018) (citing *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1287 (Del. 1994)) (held courts may refer to legislative history as a guide in the interpretation of statutes).

11