**Kenneth C. TAYLOR, Defendant Below, Appellant,**

v.

**STATE of Delaware, Plaintiff Below, Appellee.**

No. 181, 1995.

Supreme Court of Delaware.

Submitted: May 29, 1996.
Decided: July 10, 1996.

450 ■

Richard M. Baumeister, Assistant Public Defender, Office of the Public Defender, Wilmington, for Appellant.

Robert M. Goff, Jr., Deputy Attorney General, Department of Justice, Wilmington, for Appellee.

Before VEASEY, C.J., WALSH, HOLLAND, HARTNETT, and BERGER, JJ., constituting the Court en Banc.

WALSH, Justice:

In this appeal from the Superior Court, we are again required to confront the question of what constitutes a deadly weapon under Delaware law. The appellant, Kenneth C. Taylor ("Taylor"), was convicted, following a jury trial, of Burglary First Degree, Assault First Degree, two counts of Possession of a Deadly Weapon During the Commission of a Felony and Possession of a Deadly Weapon by a Person Prohibited. All the weapons offenses were predicated on the finding that a floor fan could, under the circumstances of its use in this case, constitute a deadly weapon as that term is defined in 11 Del.C. § 222(5) and (6).

Although there is no evidence that Taylor ever handled the fan in question but instead beat the victim's head against the base of the fan, we nonetheless conclude that his actions constituted the use of a deadly weapon during the commission of a felony, and by a person prohibited, within the meaning of the statutes. According, we affirm the judgments of conviction.

## I

The evidence presented by the State at trial depicted the following events which gave rise to the charges against Taylor.

Taylor and the victim, Cathy Young, were romantically involved and in April, 1994 became engaged to be married. In June of that year, however, Young began to doubt the wisdom of the relationship and apparently became involved with a third party. She relayed her doubts to Taylor and advised him that she needed time to consider the situation. Taylor was not accepting of such an arrangement and on the evening of June 10 appeared at Young's home to discuss their relationship. Taylor refused to leave or permit Young to leave. Eventually, Young managed to escape the home with her teen-aged son and remained away until 1 a.m. When she returned she bolted the door and the next day changed the lock. She later received a letter from Taylor who apologized for his behavior and advised that he would give her time to consider their future.

On June 15, 1994, after she arrived home after work, Young was told that Taylor had tried to call her collect. Later that evening Taylor attempted further collect calls which were refused. Around midnight, after her teen-aged son had retired and she was watching television, Young heard knocking at her door. She attempted to wake her son but was unsuccessful. Eventually, she opened the door in the hope of persuading Taylor to leave. Taylor entered the living room and refused to leave. At this point, Young yelled to her son to call the police. Taylor then grabbed Young and pushed her face down onto a couch. He jumped on top of her and began striking her with his fist while choking her with the other hand until she lost consciousness.

Hearing the confrontation, Young's son armed himself with a barbell and came from his bedroom. When he saw his mother she was on the floor near the couch with her head near the base of a tall floor fan. The base of the fan consisted of two metal cross pieces. There was a pool of blood on the carpet near the base of the fan. The son struck Taylor twice with the barbell and then fled the home hoping that Taylor would follow. Five minutes later he heard the front door close while he hid outside.

When Young regained consciousness she was lying on the floor, alone, in a pool of blood with her head near the crosspiece of the fan. She called the police and was taken to the hospital for treatment. The surgeon who treated her, Dr. Peter Roberts, testified that she had severe facial and head injuries including a large, deep laceration in the middle of her forehead extending to her hair line. This laceration reached to the skull and left a permanent scar. Young also sustained a second large laceration to the back of her head which also penetrated to the skull. Her nose was broken and her skull fractured at two points. She incurred a permanent loss of smell and partial loss of taste sensation.

Dr. Roberts testified that the lacerations sustained by Young were, in all likelihood, inflicted by a dense, heavy or sharp object, not by a fist. In his opinion, the pile shag carpet on the floor would not cause such injuries. The location of the two wounds suggested that the victim's head was driven down against the base of the fan and then turned to inflict another such wound on the other side of the head.

Investigating officers examined and photographed the fan. Blood was found on the floor around the base of the fan and on the base of the fan itself. Taylor was arrested near the crime scene wearing blood stained clothing. At the time of his arrest, he had no objects on his person. At trial, Taylor did not testify concerning the incident nor did he present any affirmative evidence.

At the conclusion of the State's case, Taylor moved for a judgment of acquittal as to the weapons offenses, contending that, as a matter of law, the evidence failed to establish that he had possession of a deadly weapon during the commission of any of the substantive offenses. Specifically, Taylor argued that since it was conceded that he never "used" the fan as a weapon but, at most, pushed the victim's head against the fan base, there was not sufficient evidence upon which the jury could find that he "possessed" a deadly weapon during the commission of either the assault or burglary charge. The

same contention was urged with respect to the remaining weapons charge—possession of a deadly weapon by a person prohibited. The trial judge denied the motion for judgment of acquittal. He ruled that the State's evidence, albeit circumstantial, established a *prima facie* case supporting each element of the weapons offenses, including the possession element.

On appeal, Taylor's argument is two-fold. First, he argues that there was not sufficient evidence to support the finding that the injuries sustained by the victim were caused by the fan base. Secondly, he contends that even if the fan base was the instrumentality which caused the injuries, he did not possess it within the meaning of 11 *Del.C.* § 1447 or § 1448. To the contrary, the State contends that under the present legislative definition, the fan base qualified as a deadly weapon and the evidence supports a finding that Taylor used it to inflict serious bodily injury.

## II

 We address first Taylor's contention that there is no evidentiary support for the jury's verdict on the various weapons offenses. Where a conviction is challenged on grounds of insufficient evidence, "the relevant question is whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Kornegay v. State*, Del.Supr., 596 A.2d 481, 485 (1991) (quoting *Davis v. State*, Del.Supr., 453 A.2d 802, 803 (1982); *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). In assessing the jury's factual findings, we are constrained by the "fundamental tenet of American jurisprudence that the jury is the sole trier of fact responsible for determining witness credibility, resolving conflicts in testimony and for drawing any inferences from the proven facts." *Chao v. State*, Del.Supr., 604 A.2d 1351, 1363 (1992); *Pryor v. State*, Del.Supr., 453 A.2d 98, 100 (1982).

The appellant appears to argue that there is no evidence that he exerted control over any item which could have caused the victim's injuries. He suggests that the victim could have sustained her injuries by striking her head against any stationary object in the room during her struggle. This argument fails to take into account both the physical evidence presented and the expert testimony concerning the victim's injuries.

No weapon was found on Taylor and there is no testimony that he was ever seen to strike the victim with anything other than his fists. There was little blood on the sofa where the assault began but considerable blood on the floor, in the area of the fan, where the assault ended with the victim unconscious. Dr. Roberts was of the view that the floor itself could not have caused the penetrating wounds he observed. Nor could the appellant's fists have caused such injuries. The clear inference, which the jury was free to draw based on the location and severity of the wounds, was that the assailant inflicted the injuries while the victim was on the floor by repeatedly slamming her head against the heavy metal base of the fan. Its location presented the most logical, indeed the only feasible, explanation for the nature of the injuries. This scenario is consistent with the testimony of the only other eye witness, the victim's son, who testified that when he struck Taylor with the barbell, his mother lay unconscious on the floor with her head in a pool of blood near the base of the fan and Taylor astride her. It is sheer speculation to suggest that the deep, penetrating wounds sustained by the victim could have been caused by hitting her head against any stationary object as she fell from the couch to the floor.

In our view, the jury was clearly entitled to draw the inference that Taylor beat the victim's head against the fan base while she lay on the floor, thus inflicting the injuries for which she was hospitalized. We agree with the trial judge that, on the evidence presented by the State, all the elements of a *prima facie* case supporting the use of a deadly weapon in the commission of the charged felonies existed. We thus find no error on that ruling.

## III

 The core issue in this appeal involves a question of law: whether a stationary in-

strumentality which caused an injury, not by being handled but by providing the object against which the victim's head was slammed, may be deemed a deadly weapon within the meaning of the statutory prohibition against possession of deadly weapons during the commission of a felony.

Statutory prohibitions concerning the possession of a deadly weapon preceded the adoption of the Delaware Criminal Code ("Code") but were incorporated in the Code upon its adoption in 1973. *See Delaware Criminal Code with Commentary* § 1447, at 466–67 (1973). While specific violations varied, *see* 11 *Del.C.* § 1447 (possession of a deadly weapon during the commission of a felony); 11 *Del.C.* § 1448 (possession of a deadly weapon by persons prohibited); 11 *Del.C.* § 1442 (carrying a concealed deadly weapon), all the deadly weapon offenses set forth in the 1973 Code incorporated the definition then contained in 11 *Del.C.* § 222(5).

As originally enacted § 222(5) provided:

"Deadly weapon" includes any weapon from which a shot may be discharged, a knife of any sort (other than an ordinary pocketknife carried in a closed position), switchblade knife, billy, blackjack, bludgeon, metal knuckles, slingshot, razor, bicycle chain or ice pick.

The definition was later amended to add the following sentence: "For the purpose of this definition, an ordinary pocketknife shall be a folding knife having a blade not more than 3 inches in length." 63 Del.Laws Ch. 92 (1981). This additional language clarified the definition in response to the vagueness challenge brought in *Upshur v. State,* Del.Supr., 420 A.2d 165, 168 (1980), even though we rejected the contention that the term "knife of any sort" was unconstitutionally vague. In *Upshur* this Court also noted that the offense of carrying a concealed dangerous instrument [1] under 11 *Del.C.* § 1443 is not a lesser included offense of carrying a concealed deadly weapon under § 1442 because the former requires the use or attempted use

of the instrumentality while the latter requires merely possession "without regard to lawful possession or intention or threat to cause harm." *Id.* at 169.

Although the definition of deadly weapon under § 222(5) contained a list of specific items which fall within its scope, this Court has ruled that the list is illustrative, not exhaustive. *Pauls v. State,* Del.Supr., 476 A.2d 157, 160 (1984). The use of the term "includes" indicates that the definition "is not limited to the meaning given, but in appropriate cases the word or term may be defined in any way not inconsistent with the definition given." 11 *Del.C.* § 221(b). Thus, in *Pauls* we held that a broken bottle "with its ragged, jagged, sharp cutting edges, is clearly capable of causing death and hence qualified as a deadly weapon." 476 A.2d at 160.

The somewhat expansive definition of a deadly weapon adopted in *Pauls* was restricted, however, in a subsequent decision of this Court in *Stansbury v. State,* Del.Supr., 591 A.2d 188 (1991), *cert. denied,* —— U.S. ——, 115 S.Ct. 217, 130 L.Ed.2d 145 (1994). In *Stansbury,* we declined to expand the definition of deadly weapon to include a bowling ball and a barbell because such items, in their unaltered form, "are items of common usage, and while they may become deadly instrumentalities, they are not deadly weapons." *Id.* at 193.

In reaction to the narrower interpretation of deadly weapon in *Stansbury,* the General Assembly again amended § 222(5) in 1992. This amendment added to the specific items designated as deadly weapons a generic classification of "any dangerous instrument, as defined in subsection (4) of this section which is used, or attempted to be used, to cause death or serious physical injury." 68 Del. Laws Ch. 378 (1992). Thus, the definition in its present form, and as applied in this case, now renumbered as § 222(6), reads as follows:

(6) "Deadly weapon" includes a firearm, as defined in subdivision (10) of this sec-

---

1. " 'Dangerous instrument' means any instrument, article or substance which, under the circumstances in which it is used, attempted to be used or threatened to be used, is readily capable of causing death or serious physical injury." 11

*Del.C.* § 222(5) (1995) (formerly 11 *Del.C.* § 222(4) (1973)). In 1993, the subdivisions of § 222 were renumbered, so that § 222(4) became the present § 222(5). 69 Del. Laws Ch. 24 (1993).

tion, a bomb, a knife of any sort (other than an ordinary pocketknife carried in a closed position), switchblade knife, billy, blackjack, bludgeon, metal knuckles, slingshot, razor, bicycle chain or ice pick or any dangerous instrument, as defined in subdivision (5) of this section, which is used, or attempted to be used, to cause death or serious physical injury. For the purpose of this definition, an ordinary pocketknife shall be a folding knife having a blade not more than 3 inches in length.

■ Subject to the constitutional limitations on *ex post facto* application and vagueness, the creation and definition of crimes under Delaware law is a matter for legislative enactment either through the "Criminal Code or by another law." 11 *Del.C.* § 202(a). Common law decisions may not provide the basis for defining the elements of a crime since the Criminal Code, as originally enacted and subsequently amended, "is intended to be a codification of all of the criminal law" of this State. *Delaware Criminal Code with Commentary* § 101, at 1 (1973). The provisions of the Criminal Code are to "be construed according to the fair import of their terms to promote justice and effect the purposes of the law," without strict construction. 11 *Del.C.* § 203. While the courts of this State are free to construe ambiguous provisions of the Criminal Code, where the meaning is plain, the language of the statute must be given effect. *Spielberg v. State,* Del. Supr., 558 A.2d 291, 293 (1989).

■ In our view both the purpose and meaning of the 1992 amendment to § 222(6) are clear. The General Assembly intended to add to the specific list of deadly weapons any item which had previously fallen within the designation of a dangerous instrument. In so doing, the legislature imparted to such items a "use" test which characterized those items as deadly weapons if, under the circumstances of their use, they had the potential for the infliction of death or serious physical injury. Thus, the legislature no longer defines an item as a deadly weapon

according to its common, every-day usage, *cf. Stansbury,* 591 A.2d at 193, but instead has made dispositive that item's potential for causing death or serious physical injury in the way it was actually used in the circumstances leading to the charge.

■ Another result of the 1992 amendment was to incorporate into the definitional section a classification of items which may not require possession or handling in order to constitute deadly weapons.[2] The concept of possession under § 1447(a) is thus more broadly construed in order to accommodate the definitional emphasis in § 222(6) on use or employment of the instrumentality. The resulting anomaly is that, as here, a person may be charged with possession of a deadly weapon that he does not actually touch or handle, if, in fact, that instrumentality is nonetheless used to inflict death or serious bodily injury.

Taylor argues that the 1992 amendment has changed the deadly weapon offenses from possession statutes to use statutes. This contention is correct if the term possession is given a literal meaning, *i.e.,* synonymous with "handling." One may use an item, however, without ever actually touching it and still be deemed to have exercised control over it. This case presents such a situation. While the appellant may never have handled, or even touched, the base of the fan, he nevertheless employed it in such a fashion as to cause it to become an instrumentality which inflicted serious bodily injury. From the standpoint of criminal culpability it matters little whether a perpetrator picks up an object and uses it to strike another person, or takes the other person's head and slams it against the object, producing the same result. While there may be limits to what would be deemed an instrumentality in certain situations, there appears to be no reason not to treat the fan base under consideration in this case as an instrumentality used to cause serious physical injury and thus be

---

**2.** A further, perhaps unintended consequence of the 1992 amendment is to negate the holding in *Upshur v. State,* 420 A.2d at 169, which precluded an instruction that possession of a dangerous instrument under 11 *Del.C.* § 1443 was a lesser included offense under 11 *Del.C.* § 1444 and § 1442. In effect, the 1992 amendment merged the three offenses under certain circumstances.

deemed a deadly weapon.[3]

We recognize that the definition of deadly weapons in its amended form is extremely broad, as the General Assembly obviously intended. Such expansive concepts in the criminal law carry the risk of vagueness and unreasonable enforcement. While we do not find such risk in this case, we recognize the potential. In that respect we repeat the caution earlier expressed by this Court in upholding the application of the deadly weapon statute to items of every day use.

> Apart from speculation, there is no indication that the State or police agencies have resorted to hypertechnical application of the deadly weapon statute to prosecute otherwise innocent possession of [items in common usage]. In the absence of evidence of prosecutorial abuse, we assume that a common sense enforcement, consistent with the obvious legislative intent, is sufficient answer [to such concern].

*State v. Anderson*, Del.Supr., No. 97, 1992, 1992 WL 353826 Walsh, J. (Oct. 7, 1992) (ORDER).

The judgments of conviction are affirmed.

---

**3.** The State acknowledges that fixtures, *i.e.*, items which, under the law of property, are deemed part of the real estate would not qualify as dangerous instruments, regardless of use. *See Edwards v. United States*, D.C.App., 583 A.2d 661 (1990).