Robert B. JOHNSON, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

No. 131, 1997.

Supreme Court of Delaware.

Submitted: April 16, 1998.
Decided: May 28, 1998.

Kathleen Jennings, Oberly & Jennings, P.A., Wilmington, for appellant.

John Williams, Deputy Attorney General, Dover, for appellee.

Before VEASEY, C.J., HOLLAND and HARTNETT, JJ.

HOLLAND, Justice:

Following a jury trial in the Superior Court, the defendant-appellant, Robert B. Johnson ("Johnson"), was convicted of Assault in the First Degree and Possession of a Deadly Weapon During the Commission of a Felony. Johnson was sentenced to six years incarceration for the assault conviction and ten years incarceration for the deadly weapon conviction. The sentences were consecutive.

Johnson has raised four contentions in this direct appeal. First, he argues that the Superior Court erred by amending the deadly weapon count in the grand jury indictment. Second, Johnson submits that the Superior Court's instruction to the jury on the issue of accomplice liability was incorrect, as a matter of law. Third, Johnson argues that the Superior Court erred, as a matter of law, in its instructions to the jury concerning the lesser-included offenses of Assault in the First Degree. Fourth, Johnson contends that certain remarks made during the prosecutor's closing argument were not supported by the evidence and constituted plain error.

This Court has concluded that Johnson's first two contentions are meritorious. Accordingly, both judgments of conviction must be reversed. Because these proceedings will be the subject of a new trial, we have also addressed Johnson's remaining two arguments.

### Facts

On the night of October 11, 1993, Johnson, accompanied by two male and two female friends, went to a bar in New Castle, Delaware. At the bar, an argument occurred between Johnson and another patron, Edward Woodward ("Woodward"). A fight broke out and Woodward sustained multiple facial injuries.

According to Angel Bass ("Bass"), the bartender working that evening, Johnson punched Woodward first. Johnson's two male friends then joined Johnson in assaulting Woodward. Bass identified Johnson at trial as the main perpetrator of the assault. Bass testified that Woodward was punched, kicked and hit with chairs and beer bottles by Johnson and his two male friends. Bass also testified that Johnson threw a metal table down on Woodward's face, after Woodward had been knocked to the floor.

Two other bar patrons that evening were Daniel E. Zeitlow ("Zeitlow") and Herman Lopez ("Lopez"). Their testimony at trial was consistent with Bass' description of the altercation between Johnson, his two male friends, and Woodward. Both Zeitlow and Lopez confirmed that the three men attacked Woodward with chairs. Lopez testified that he saw one of the three assailants pick up a metal table and drop it on Woodward. Lopez also testified that, during the assault on Woodward, some female patrons were "cheering and jumping ."

When Bass called the police, Johnson and his friends left the bar. Police Detective Mark MacMicking of the Delaware State Police, arrived at the bar shortly after 12:24 a.m. on October 12, 1993. Detective MacMicking found Woodward lying on the floor in a pool of blood. There were broken glass bottles and chairs on the floor around Woodward.

As a result of the fight, Woodward's left cheek bone and his nasal bones were fractured, his upper jaw was fractured on both sides, and there was a two-inch laceration over his nose. Dr. Lawrence Giordano, an oral maxillofacial surgeon, performed reconstructive surgery on Woodward's face on October 14, 1993.[1] According to Dr. Giordano, the scarring from the surgery might become

---

1. Corporal Ronald Kline of the Delaware State Police took photographs of Woodward's facial injuries at the Christiana emergency room.

"almost invisible," except for the scar over the bridge of Woodward's nose which would probably be permanent.

Defense witnesses Kathy Cianci and Romelia Gutierrez, who had accompanied Johnson to the bar, both testified that they did not see Johnson strike anyone with a bottle, chair, or table. Both of these defense witnesses testified that Woodward started the fight by striking Johnson first. In his defense, Johnson also introduced Woodward's medical records into evidence. According to those records, Woodward was combative at the hospital and tested positively for having phencyclidine and cocaine in his system.

Neither Woodward nor Johnson testified at the Superior Court trial. Woodward was not present at trial and could not be located.

### Grand Jury Action
### Indictment and Reindictment

Johnson was originally indicted by the grand jury in 1995 and charged with Assault in the First Degree. The single count indictment alleged that Johnson possessed a deadly weapon or dangerous instrument during the assault. Those items were identified as "glass bottles and chairs."

On June 24, 1996, Johnson was reindicted by the grand jury. The reindictment contained two charges. The first count was Assault in the First Degree.[2] It was modified from the original charge to read "glass

bottle and/or a chair." The second count in the new indictment charged Johnson with Possession of a Deadly Weapon During the Commission of a Felony.[3] The deadly weapon was described as "a chair."

### Deadly Weapon Count Expanded
### Superior Court Amends Indictment

After the State had completed its case-in-chief, the Superior Court *sua sponte* raised an issue regarding the deadly weapon charge. The trial judge noted that most of the State's evidence at trial had demonstrated that Johnson possessed a metal table during the assault upon Woodward.[4] The State moved to amend the deadly weapon count in the grand jury's indictment to include the table. Over the objection of Johnson's trial attorney, the Superior Court permitted the weapon count in the indictment to be amended to describe the deadly weapon allegedly possessed by Johnson to be a chair "and/or a table."

At the close of all the evidence, the jury was instructed that it could find Johnson guilty of the deadly weapon count if it unanimously found that Johnson possessed a chair, or if it unanimously found that Johnson possessed a table, during the assault on Woodward. The jury found Johnson guilty of the deadly weapon offense. The jury's verdict did not specify which "deadly weapon" the jury found Johnson had used during the assault. Consequently, the record does not reflect whether the trial jury found Johnson

2. The first count of the reindictment charged Johnson with:
 ASSAULT FIRST DEGREE in violation of Title 11, Section 613, of the Delaware Code of 1974, as amended.
 ROBERT B. JOHNSON, on or about the 12th day of October, 1993, in the County of New Castle, State of Delaware, did intentionally cause serious physical injury to Edward Woodward by means of a dangerous instrument or deadly weapon, to wit: did strike him about the head with a glass bottle and/or a chair.

3. The second count of the reindictment charged Johnson with:
 POSSESSION OF A DEADLY WEAPON DURING THE COMMISSION OF A FELONY in violation of Title 11, Section 1447 of the Delaware Code of 1974, as amended.

ROBERT B. JOHNSON, on or about the 12th day of October, 1993, in the County of New Castle, State of Delaware, did possess a chair, a deadly weapon, during the commission of Assault First Degree, as set forth in Count I of this indictment.

4. The record reflects the following remarks by the trial judge:

 Is there any issue regarding any amendment of the indictment which charges that the deadly weapon was a chair and yet most of the evidence seems to point to a table? I mean there's evidence that chairs and bottles were flying, and yet there's two very specific items of testimony that said a table was used.

 The State then moved to amend the deadly weapon count of the grand jury's indictment to read, "did possess a chair and/or a table."

guilty as charged in the grand jury's indictment of possessing a chair, or guilty of possessing a table pursuant to the indictment as amended by the Superior Court.

Johnson argues that the instrumentality described in the weapon count of the grand jury indictment is an essential and material element of the alleged crime. Therefore, Johnson submits that the addition of the term "and/or a table" constituted a substantive amendment by the Superior Court. Accordingly, Johnson contends that the Superior Court violated his right to be proceeded against in a felony prosecution only upon an indictment by a grand jury.[5]

### History and Origin
### Grand Jury Indictment

The institution of the grand jury has a venerable history in England. For centuries, when conflicts arose between the powers of the English monarchs and the rights of their subjects, the grand jury was a barrier against persecution in the sovereign's name. Over time, the grand jury "came to be regarded as an institution by which the subject was rendered secure against oppression from unfounded prosecutions of the Crown."[6]

The English grand jury system has been an integral part of America's jurisprudence *ab initio*.[7] The Fifth Amendment to the United States Constitution provides that federal prosecutions for serious crimes *must* be

initiated by a grand jury indictment.[8] The perpetuation of the grand jury's historic function in the United States Constitution "as the sole method for preferring charges in serious [federal] criminal cases shows the higher place it held as an instrument of justice."[9] Like its English progenitor, the Fifth Amendment grand jury provision was intended to operate as an independent and objective method for commencing a serious criminal proceeding.[10]

### Grand Jury Indictment
### State Constitutional Protection

When the federal Bill of Rights was originally adopted in 1791, those first ten amendments to the United States Constitution were only a protection against action by the federal government.[11] As a consequence of the adoption of the Fourteenth Amendment to the United States Constitution, many of the guarantees found in the federal Bill of Rights have been deemed incorporated by the Due Process Clause to provide protection against infringement by state action.[12] The United States Supreme Court has held, for example, that the right to trial by jury in a criminal proceeding in state courts is guaranteed to defendants by the Fourteenth Amendment.[13] Conversely, the Seventh Amendment guarantee of jury trials in a civil proceeding has not been held to be binding upon the states by incorporation through the Due Process Clause of the Fourteenth Amendment.[14]

5. Del. Const. art. I, § 8.

6. *Ex parte Bain*, 121 U.S. 1, 11, 7 S.Ct. 781, 30 L.Ed. 849 (1887).

7. *Costello v. United States*, 350 U.S. 359, 362, 76 S.Ct. 406, 100 L.Ed. 397 (1956).

8. *Costello v. United States*, 350 U.S. at 361–62, 76 S.Ct. 406.

9. *Costello v. United States*, 350 U.S. at 362, 76 S.Ct. 406.

10. *Costello v. United States*, 350 U.S. at 362, 76 S.Ct. 406.

11. *Barron v. Baltimore*, 32 U.S. (7 Pet.) 243, 8 L.Ed. 672 (1833).

12. *See McCool v. Gehret*, Del.Supr., 657 A.2d 269, 281 (1995). For discussions regarding the incorporation of the federal Bill of Rights into the Due Process Clause of the Fourteenth Amendment, thereby making them applicable to the states, see Louis Henkin, *"Selective Incorporation" in the Fourteenth Amendment*, 73 Yale L.J. 74 (1963). *See* Richard C. Cortner, *The Supreme Court and the Second Bill of Rights: The Fourteenth Amendment and the Nationalization of Civil Liberties* (1981); Akhil Reed Amar, *The Bill of Rights and the Fourteenth Amendment*, 101 Yale L.J. 1193 (1992); Michael K. Curtis, *The Fourteenth Amendment and the Bill of Rights*, 14 Conn.L.Rev. 237 (1982); Charles Fairman, *Does the Fourteenth Amendment Incorporate The Bill of Rights?* 2 Stan.L.Rev. 5 (1949).

13. *Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968).

14. *Minneapolis & St. Louis R.R. v. Bombolis*, 241 U.S. 211, 36 S.Ct. 595, 60 L.Ed. 961 (1916). *See McCool v. Gehret*, 657 A.2d at 281–82.

The Fifth Amendment provisions relating to the grand jury have always been binding upon the federal courts. The United States Supreme Court has never held, however, that the Fifth Amendment concepts of a "grand jury" are applicable to the states by virtue of the Fourteenth Amendment incorporation doctrine.[15] In an opinion released only five days after Johnson's case was argued before this Court, the United States Supreme Court reiterated its 1884 holding in *Hurtado v. California*, noting that the "Fifth Amendment requires the Federal Government to use a grand jury to initiate a prosecution and 22 states adopt a similar rule as a matter of state law."[16]

Therefore, Johnson's constitutional challenge to the Superior Court's amendment of the indictment is based exclusively upon the grand jury protections in the Delaware Constitution.

### Delaware Constitution
### 1897 Grand Jury Debate

At common law, both in England and in colonial America, no one could be proceeded against in a criminal prosecution, for an indictable offense, unless a true bill was returned by the grand jury.[17] That common law right was preserved in the original Delaware Constitution of 1776. It has been set forth explicitly in every subsequent Delaware Constitution.

The purpose of requiring indictment by a grand jury in the 1776, 1792, and 1831 Delaware Constitutions, and specifically prohibiting proceeding by an Attorney General's information, was to limit a person's jeopardy for criminal offenses to those felony charges that are brought by a group of his or her fellow citizens, who are acting independently of the prosecuting attorney.[18] During the Delaware Constitutional Convention of 1897, there was a proposal by Edward G. Bradford, Jr.[19] to eliminate the right to indictment by a grand jury for certain felonies. One of the delegates who spoke in opposition to that suggestion was William C. Spruance ("Spruance"), a prominent lawyer from New Castle County.[20] Spruance acknowledged the history of integrity established by prior Delaware Attorney Generals.[21] Nevertheless, in urging the 1897 Convention not to remove the grand jury protection that had existed in the Delaware Constitutions of 1776, 1792 and 1831, Spruance stated:

> But I want this Convention to know, and the people of Delaware to know, that I hold my liberties at the mercy of no man. I hold my head erect. I obey the laws of my State and my country, and I want no law to be made—no Constitution made—that shall subject me or put me at the mercy of any Attorney–General.
>
> More than that, I do not want it to be in his power to transfix me before the public gaze as a violator of the law, and bring me to the bar of public opinion at his own sweet will. I want to put a curb in his mouth that before he shall open it to make a public accusation against me, he shall make it before a grand jury, with his witnesses there to make out a *prima facie* case. I want this done before he shall have the power to drag me before the bar of public opinion, much less before he shall drag me before the judges for trial as to my guilt or innocence.

---

15. *See Hurtado v. California*, 110 U.S. 516, 538, 4 S.Ct. 111, 28 L.Ed. 232 (1884). *Alexander v. Louisiana*, 405 U.S. 625, 635, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972) (Douglas, J. concurring).

16. *Campbell v. Louisiana*, —— U.S. ——, 118 S.Ct. 1419, 140 L.Ed.2d 551 (1998).

17. *See Ex parte Bain*, 121 U.S. 1, 7 S.Ct. 781, 30 L.Ed. 849 (1887); 4 William Blackstone, *Commentaries* **299–303; 1 Holdworth, *History of English Law* 312–323 (1927).

18. *See Stirone v. United States*, 361 U.S. 212, 218, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960).

19. Bradford served as a Federal District Court Judge for Delaware from 1897 to 1918.

20. Spruance had been the United States Attorney for Delaware from 1876 to 1880. He became the first Superior Court Resident Judge of New Castle County after the Delaware Constitution of 1897 was adopted and served until 1909.

21. Those high standards have been maintained by Delaware Attorney Generals to this day. *See Kipp v. State*, Del.Supr., 704 A.2d 839, 842 (1998) (prosecutor's confession of error).

And when at last that ordeal has been passed, when having got to a trial—not by the will merely of the Attorney–General or allowed not to be tried by his forbearance—but when I am brought to trial by a finding of the grand jury of my State, then I want something more. I want a trial by a jury of my countrymen.[22]

Ten of the thirty delegates to the Delaware Constitution Convention of 1897 were lawyers.[23] The debates during the 1897 Convention reflect a depth of scholarly knowledge about the historic evolution of the common law and the role reserved for the states *vis a vis* the role delegated to federal government in the United States Constitution.[24] The 1897 debates discussed the common law role of both the grand jury and the petit jury. Spruance also read at length from the *Commentaries on the Law of England* written by that country's pre-eminent eighteenth century legal authority, William Blackstone, which states, "The law has therefore wisely placed this strong and two-fold barrier of presentment and trial by jury between the liberties of the people and the prerogative of the Crown." [25]

The 1897 debaters noted that, prior to the Revolutionary War, John Dickinson had studied the common law of England at the Middle Temple, making Dickinson a contemporary colleague of William Blackstone at that Inn of Court in London.[26] This was significant for two reasons. First, John Dickinson was elected president of the Delaware Constitutional Convention in 1791.[27] Second, the provisions requiring grand jury indictments were first specifically identified in the Delaware Constitution of 1792, where "*all* of the fundamental features of the jury system, as they existed at common law, [were] preserved for Delaware's citizens." [28]

Moreover, the 1897 Delaware Convention specifically addressed the implications of the 1884 holding by the United States Supreme Court in *Hurtado v. California,* that the Fifth Amendment grand jury right in the United States Constitution did not apply in state court criminal proceedings.[29] In further response to the suggestion that grand jury indictment be eliminated in favor of prosecution by information for certain offenses, Mr. Spruance described presentment of an indictment by a grand jury before permitting the commencement of a felony prosecution, as the "other palladium of liberty"—the first being trial by petit jury.[30] In support of retaining the grand jury section in the Delaware Constitution, William C. Spruance argued, in part:

> I have had some experience in that business. I have been District Attorney and Assistant District Attorney of the United States, and of course I never had occasion to go beyond the express provisions of the Constitution, and never filed an information in my life. I prepared indictments and sent them before the grand jury....

22. Comments of William C. Spruance, *in* 1 *Debates and Proceedings of the Constitutional Convention of the State of Delaware 1896–1897*, at 591 (1958) (hereinafter "*Debates* ").

23. The ten lawyer-delegates were Edward D. Hearne, Woodburn Martin, and Charles F. Richards of Sussex County; Ezekiel W. Cooper of Kent County; and John Biggs, Edward G. Bradford, Jr., Martin B. Burris, Charles B. Evans, Robert G. Harman, and William C. Spruance of New Castle County. *See* Henry R. Horsey, Henry N. Herndon, Jr. & Barbara MacDonald, *The Delaware Constitutional Convention of 1897, in The Delaware Constitution of 1897: The First One Hundred Years* 60 (Randy J. Holland et al. eds., 1997).

24. *See e.g.* Comments of William C. Spruance, *in* 1 *Debates*, at 586–87 (reading from 3 J. Story, *Commentaries on the Constitution of the United States* §§ 1772–77, 1780 (1833)).

25. Comments of William C. Spruance, *in* 1 *Debates*, at 581 (quoting 4 William Blackstone, *Commentaries* *343). *See also* Comments of William C. Spruance, *in* 1 *Debates*, at 587–88.

26. Comments of William C. Spruance, *in* 1 *Debates*, at 582; Dudley Cammet Lunt, *Tales of the Delaware Bench and Bar* 77 (1963).

27. *Claudio v. State*, Del.Supr., 585 A.2d 1278, 1295 (1991).

28. *Claudio v. State*, 585 A.2d at 1298.

29. Comments of Edward G. Bradford, Jr., *in* 1 *Debates*, at 563–64, 580.

30. Comments of William C. Spruance, *in* 1 *Debates* at 587.

[T]he Constitution of the United States interposes a bar so far as the District Attorney of the United States is concerned. It imposes a bar between the Executive officers and the citizens in this; that they shall not bring this man to trial; they shall not make this charge except through a grand jury which sits in secret, hears one side of the case and does not hear anything for the defense. It hears all the prosecuting witnesses may have to say upon the subject and what the prosecuting attorney may have to say, and the Constitution says to him if you cannot make out a *prima facie* case to the satisfaction of the grand jury, then that man shall never be called upon to answer to that charge.

Our forefathers found that a safe protection; and my forty years and more of experience in the practice of the administration of justice leads me to give my hearty and unqualified approval to that system. I hope never to see it abolished. If the State cannot make out a case where they have access to that tribunal and where the accused has no access at all, either in person or by his witnesses; I say if the prosecuting officer cannot make out a case to the satisfaction of the grand jury ... Then the accused should go free.[31]

"The proposal to limit the fundamental rights of a grand jury indictment and a jury trial was probably the most hotly debated item of the convention."[32] When the debates ended, the grand jury and jury trial protections of the 1776, 1792, and 1831 Delaware Constitutions were retained in the 1897 Delaware Constitution's Bill of Rights.[33] It

is poignant to note that one hundred years later, the United States Supreme Court has reaffirmed the views expressed by Spruance in 1897, by stating, "[t]he grand jury, like the petit jury, 'acts as a vital check against the wrongful exercise of power by the State and its prosecutors.' "[34]

### Delaware Constitution
### Common Law Grand Jury

The Delaware Bill of Rights, in Article I, Section 8 of the present Delaware Constitution of 1897, provides:

> No person shall for any indictable offense be proceeded against criminally by information, except in cases arising in the land or naval forces, or in the militia when in actual service in time of war or public danger....

The effect of the decision in 1897 to retain this section from the Delaware Constitutions of 1792 and 1831 in the present Delaware Constitution is two-fold: first, "to establish the grand jury as a constitutional body;" and second, "to preserve the historical and highly prized safeguard of Grand Jury action' with its common law powers and attributes, except as modified by other provisions of the [Delaware Constitution]."[35]

At its common law inception, an indictment could be amended only by the grand jury that had returned the true bill.[36] The common law evolved to permit judicial amendments to indictments, as to matters of form,

---

31. Comments of William C. Spruance, *in* 1 *Debates*, at 588. In contrast, the former Chief Judge of the New York Court of Appeals, Sol Wachtler, is reported to have stated publicly that, if requested by the prosecutor, a New York grand jury would indict a ham sandwich. *See People v. Carter*, 77 N.Y.2d 95, 564 N.Y.S.2d 992, 997, 566 N.E.2d 119, 124 (1990) (Titone, J., dissenting) (citing Wolfe, *The Bonfire of the Vanities*, at 603, quoting Chief Judge Wachtler). That disparaging view of the grand jury was not shared by either the Framers of the United States Constitution, or the authors of the Delaware Constitutions, and has not been shared by any subsequent Delaware General Assembly or this Court.

32. Rodman Ward, Jr. and Paul J. Lockwood, *Bill of Rights—Article I*, in *The Delaware Constitution

of 1897: The First One Hundred Years* 81 (Randy J. Holland et al. eds., 1997).

33. Del. Const. art. I, § 8. *See also Claudio v. State*, Del.Supr., 585 A.2d 1278, 1297 (1991).

34. *Campbell v. Louisiana*, —— U.S. at ——, 118 S.Ct. 1419, 140 L.Ed.2d 551 (quoting *Powers v. Ohio*, 499 U.S. 400, 411, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991)).

35. *In re Opinions of the Justices*, Del.Supr., 88 A.2d 128, 131 (1952) (quoting *State v. Lyons*, 5 A.2d 495, 497 (1939)).

36. *State v. Blendt*, Del.Super., 120 A.2d 321, 324 (1956).

with the concurrence of the grand jury.[37] The rationale for the common law rule consent requirement was that, "since an indictment was the act of the grand jury under oath, the court could not make alterations without the grand jury's authorization." [38]

In furtherance of this common law principle, the grand jury, at the time it was sworn, consented to amendment of its indictments by the court, with regard to matters of form but not matters of substance.[39] This common law practice has been continued in Delaware. Today, "the consent of the grand jury to amendments of matters of form is obtained when the grand jury presents its indictments to the [Superior] Court." [40]

In Delaware, when indictments are accepted from the foreperson in open court, the grand jury is assembled and the Prothonotary asks the following questions:

Do you have any bills or presentments to hand to the Superior Court?

Are you content that the Superior Court shall amend any matter of form without your consent, providing nothing of substance is changed?

If the first question is answered affirmatively, it is routine for an affirmative response to be made to the latter inquiry also.[41] Pursuant to this historic practice in Delaware, by virtue of which the prior consent of the grand jury is obtained, the Superior Court is authorized to amend indictments as to matters of form only.[42]

Accordingly, Rule 7(e) of the Superior Court Criminal Rules permits an indictment to be amended before verdict if "no additional or different offense is charged and if substantial rights of the defendant are not prejudiced." This rule reflects the common law grand jury principles that have been embodied in the Delaware Constitution.[43] The Delaware Bill of Rights permits grand jury

indictments to be amended as to form, but not as to substance.[44]

The right to have the grand jury make the charge on its own judgment is a right that remains guaranteed by the present Delaware Constitution of 1897. If the Superior Court could amend indictments substantively at the prosecutor's request, the State would have the power to obtain convictions based on theories or on evidence possibly rejected, or not considered, by the grand jury. Justice Miller, writing for the United States Supreme Court, stated:

"If it lies within the province of a court to change the charging part of an indictment to suit its own notions of what it ought to have been, or what the grand jury would probably have made it if their attention had been called to suggested changes, the great importance which the common law attaches to an indictment by a grand jury, as a prerequisite to a prisoner's trial for a crime, and without which the Constitution says 'no person shall be held to answer,' may be frittered away until its value is almost destroyed." [45]

For more than two hundred years Delaware's Constitutions have afforded its citizens the right of being proceeded against in a felony criminal prosecution only upon an indictment by the grand jury. The prejudice caused by the Superior Court's substantive amendment of an indictment is always the same—the defendant loses the protection of being proceeded against in a felony prosecution only upon indictment by the grand jury, that is guaranteed by Delaware Constitution.[46]

### Deadly Weapon Definition
### Illustrative List and Use Test

To determine whether the Superior Court's amendment of the deadly weapon

**37.** *State v. Blendt,* 120 A.2d at 324.

**38.** *State v. Blendt,* 120 A.2d at 324.

**39.** *State v. Blendt,* 120 A.2d at 325.

**40.** *State v. Blendt,* 120 A.2d at 324.

**41.** *See State v. Blendt,* 120 A.2d at 324.

**42.** *State v. Blendt,* 120 A.2d at 324.

**43.** Del. Const. art. I, § 8.

**44.** *See State v. Blendt,* 120 A.2d at 324.

**45.** *Stirone v. United States,* 361 U.S. 212, 216, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960) (quoting *Ex parte Bain,* 121 U.S. 1, 10, 7 S.Ct. 781, 30 L.Ed. 849 (1887)).

**46.** Del. Const. art. I, § 8.

count in the indictment returned against Johnson by the grand jury was a change in form or substance, we begin with an examination of the relevant legislative history. Statutory prohibitions concerning the possession of a deadly weapon were provided for in the Delaware Criminal Code upon its adoption in 1973, and in the statutes that preceded the Code.[47] Although specific violations varied, all of the deadly weapon offenses set forth in the 1973 Code incorporated the definition of "deadly weapon" contained in 11 *Del. C.* § 222(5).[48] In 1973, Section 222(5) provided:

> "Deadly weapon" includes any weapon from which a shot may be discharged, a knife of any sort (other than an ordinary pocket knife carried in a closed position), switchblade knife, billy, blackjack, bludgeon, metal knuckles, slingshot, razor, bicycle chain or ice pick.[49]

That definition was later amended to add the following sentence: "For the purpose of this definition, an ordinary pocketknife shall be a folding knife having a blade not more than three (3) inches in length." [50]

The term "includes" in Section 222(5) signifies the General Assembly's intention that the definition of "deadly weapon" in Section 222(5) "is not limited to the meaning given, but in appropriate cases the word or term may be defined in any way not inconsistent with the definition given." [51] Accordingly, this Court has held that the list of specific items identified as deadly weapons in Section 222(5) is illustrative, rather than exhaustive.[52] In *Pauls*, for example, this Court determined that a broken bottle, "with its ragged, jagged, sharp cutting edges, is clearly capable of causing death," and hence qualified as a deadly weapon.[53]

The General Assembly amended Section 222(5) again in 1992. This amendment added to the specific items designated as deadly weapons a generic classification of "any dangerous instrument, as defined in subsection (4) of this section which is used, or attempted to be used, to cause death or serious physical injury." [54] The statutory definition of deadly weapon in its present form, now renumbered as Section 222(6), reads as follows:

> "Deadly weapon" includes a firearm, as defined in subdivision (10) of this section, a bomb, a knife of any sort (other than an ordinary pocketknife carried in a closed position), switchblade knife, billy, blackjack, bludgeon, metal knuckles, slingshot, razor, bicycle chain or ice pick or any dangerous instrument, as defined in subdivision (5) of this section, which is used, or attempted to be used, to cause death or serious physical injury. For the purpose of this definition, an ordinary pocketknife shall be a folding knife having a blade not more than 3 inches in length.[55]

Thus, the definition of deadly weapon in the Delaware Criminal Code is no longer limited to an item's common or intended usage.[56]

As a result of the 1992 "use test" amendment to Section 222(6), the definition of deadly weapons is now expansive. The "use test" makes ordinary items, that otherwise serve a legitimate function in daily life, deadly weapons if, under the circumstances of their use, they had the potential for the infliction of death or serious physical injury. Accordingly, in construing Section 222(6), as amended in 1992, this Court has concluded that the use of an electronic floor fan to seriously assault someone constituted Possession of a Deadly Weapon During the Commission of a Felo-

47. *Taylor v. State*, Del.Supr., 679 A.2d 449, 453 (1996).

48. *See* 11 *Del. C.* § 1442 (Carrying a Concealed Deadly Weapon); 11 *Del. C.* § 1447 (Possession of a Deadly Weapon During the Commission of a Felony); 11 *Del. C.* § 1448 (Possession of a Deadly Weapon by Persons Prohibited).

49. 59 Del. Laws ch. 203 (1973); 58 Del. Laws ch. 497 (1972).

50. 63 Del. Laws ch. 92 (1981).

51. 11 *Del. C.* § 221(b).

52. *Taylor v. State*, 679 A.2d at 453. *See Pauls v. State*, Del.Supr., 476 A.2d 157, 159–60 (1984).

53. *Pauls v. State*, 476 A.2d at 160.

54. 68 Del. Laws ch. 378 (1992).

55. 11 *Del. C.* § 222(6).

56. *Taylor v. State*, 679 A.2d at 454.

ny.[57] The 1992 amendment explains how Johnson could be indicted by the grand jury for Possessing a Deadly Weapon During the Commission of a Felony by assaulting Woodward with a chair.

### Deadly Weapon Indictment Instrument's Description Substantive

■ The Superior Court granted the State's motion to amend Johnson's indictment for Possession of a Deadly Weapon During the Commission of a Felony, changing the weapon allegedly used from "chair" to "chair and/or table." The description of the instrument used during a felonious assault is an essential element of the crime of Possession of a *Deadly Weapon* During the Commission of a Felony.[58] The substantive nature of the Superior Court's amendment to the weapon count in the grand jury's indictment of Johnson is reflected in the prior decisions of this Court.[59]

In *Harley*, the defendant was charged with Possession of a Deadly Weapon During the Commission of a Felony, as well as Assault. The indictment in *Harley* described the deadly weapon as a "tire iron," but the evidence presented by the State at trial established that the item used was actually part of a jack stand. Nevertheless, a jury found Harley guilty on both charges. After the verdict, the Superior Court granted the State's motion to amend the indictment, changing the weapon from "tire iron" to "jack stand." Harley appealed. This Court determined that there was a substantive difference between a tire iron and a jack stand. Therefore, Harley's conviction for Possession of a Deadly Weapon During the Commission of a Felony had to be reversed.[60]

■ The *Harley* decision is remarkably similar factually to Johnson's case. Johnson was indicted by the grand jury for possessing a chair as a deadly weapon. The State's most probative evidence at trial on the deadly weapon offense, however, demonstrated that Johnson possessed a table. The only difference is that the Superior Court allowed the State to amend the indictment before the jury deliberated in Johnson's case, rather than after the verdict, as in *Harley*. Any ambiguity created by a substantive variance between the material elements of the felony alleged in the grand jury's indictment and the State's proof at trial cannot be corrected, however, by a judicial amendment either before or after the petit jury's verdict.[61]

In Johnson's case, we cannot know if the grand jury would have returned an indictment for a deadly weapon count based upon Johnson's possession of a table. Nonetheless, because of the "table" evidence admitted against Johnson at trial and the Superior Court's instructions to the jury after amending the indictment, the trial jury may have convicted Johnson based on possession of a table. "If so, he was convicted on a charge the grand jury never made against him." [62] As the United States Supreme Court held in *Bain*, when construing the grand jury protection in the federal system,

[A]fter the indictment was changed it was no longer the indictment of the grand jury who presented it. Any other doctrine would place the rights of the citizen, which were intended to be protected by the constitutional provision, at the mercy or control of the court or prosecuting attorney.... [63]

■ The judgment of conviction for Johnson's Possession of a Deadly Weapon During the Commission of a Felony must be re-

57. *Taylor v. State*, 679 A.2d at 454. *Cf. Stansbury v. State*, Del.Supr., 591 A.2d 188, 193(1991) (interpreting "deadly weapon" definition prior to 1992 amendment).

58. *Harley v. State*, Del.Supr., 534 A.2d 255, 256–57 (1987).

59. *Harley v. State*, Del.Supr., 534 A.2d 255 (1987).

60. *Harley v. State*, 534 A.2d at 256–57. *See Kornegay v. State*, Del.Supr., 596 A.2d 481, 488

(1991). *Cf. Walls v. State*, Del.Supr., 560 A.2d 1038, 1048 (1989).

61. *Harley v. State*, 534 A.2d at 257.

62. *Stirone v. United States*, 361 U.S. 212, 219, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960).

63. *Ex parte Bain*, 121 U.S. 1, 13, 7 S.Ct. 781, 30 L.Ed. 849 (1887).

versed. The identification of the instrumentality allegedly used is a material element of a deadly weapon charge. The judicial amendment of that material element of the deadly weapon count in the grand jury indictment by the Superior Court was a substantive change.[64] It violated Johnson's right to be indicted by a grand jury that is guaranteed by the Delaware Constitution.[65]

In *Harley,* the appellant's conviction was reversed and a judgment of acquittal was entered because the evidence offered at trial did not support a conviction under the deadly weapon count of the indictment as it was returned by the grand jury.[66] Unlike the *Harley* case, however, the State did present evidence that Woodward was hit with a chair by one or more of his assailants, as charged in the original indictment and also in the reindictment. Johnson can be retried for the weapon offense because the jury *may* have concluded that Johnson was guilty as originally charged of possessing a chair.

### Section 271 and Section 274 Accomplice Liability Instruction

According to the State's evidence at trial, three men assaulted Woodward simultaneously. Johnson based his defense, in part, on the assertion that he did not participate in the attack on Woodward. In response to this defense, the State sought to convict Johnson for either personally assaulting Woodward or on the alternative theory of accomplice liability.

The Superior Court granted the State's request to instruct the jury that it could find Johnson guilty for the offense of assault under the theory of accomplice liability.[67] Those accomplice liability instructions properly included the statement that Section 271 places responsibility on the defendant "for a crime which is a foreseeable consequence of

the of the underlying criminal conduct, even though it was not specifically agreed upon in advance." [68]

The Superior Court, however, denied Johnson's request for an instruction pursuant to Section 274. In pertinent part, Section 274 provides:

> When, pursuant to § 271 ..., 2 or more persons are criminally liable for an offense which is divided into degrees, each person is guilty of an offense of such degree as is compatible with that person's own culpable mental state and with that person's own accountability for an aggravating fact or circumstance.[69]

The Superior Court ruled the issue of Johnson's mental state was adequately addressed by the "reasonable foreseeability" language included in the Section 271 instruction:

> I wish I could say with a greater degree of certainty than I can, but I don't believe a [Section 274] instruction is warranted in this case.

> What [defendant] attacks here is the aggravating fact of serious physical injury and use of a deadly weapon....

> [T]hat concept is adequately covered by the reasonably foreseeable language in the accomplice liability charge and it would be redundant to apply them in the same fashion.

On appeal, Johnson argues that the Superior Court committed reversible error by failing to instruct the jury pursuant to the provisions of Section 274. According to Johnson, that error deprived him of his statutory right to have an individualized determination of his own culpable mental state and accountability. Johnson's argument is correct.[70]

■ Section 274 incorporates Section 271 by reference.[71] The use of the word "offense" in Section 271 and the use of that

64. *Harley v. State,* 534 A.2d at 257.

65. Del. Const. art. I, § 8.

66. *Harley v. State,* 534 A.2d at 257.

67. 11 *Del.C.* § 271. *See Probst v. State,* Del. Supr., 547 A.2d 114 (1988).

68. *See Chance v. State,* Del.Supr., 685 A.2d 351, 357 (1996); *Claudio v. State,* Del.Supr., 585 A.2d 1278, 1282 (1991).

69. 11 *Del.C.* § 274.

70. *Chance v. State,* 685 A.2d at 357.

71. *Chance v. State,* 685 A.2d at 357.

same word in Section 274 must be construed *in pari materia.*[72] Accordingly, Sections 271 and 274 require the jury to undertake a two-part analysis when the State proceeds on a theory of accomplice liability.

First, the jury must decide whether the State has established that the defendant was an accomplice to a criminal offense committed by another person. This inquiry implicates the provisions of Section 271. In reaching its decision on accomplice liability, the jury is permitted to consider the principle of reasonable foreseeability. Thus, Section 271 would permit the jury to find Johnson liable for the assault on Woodward, even if that was not the outcome Johnson intended, as long as the consequential attack on Woodward was reasonably foreseeable by Johnson.

Second, if a defendant is found liable for a criminal offense under a theory of accomplice liability, and if that offense is divided into degrees, then the jury must determine what degree of the offense the defendant committed. That conclusion must be based on an *individualized* determination of the defendant's mental state and culpability for any aggravating fact or circumstances. This inquiry implicates the provisions of Section 274.

In the context of Johnson's case, the term "offense" means "assault."[73] There are three degrees to the offense of assault. The various degrees are distinguished by the defendant's mental state, the severity of the injury inflicted, and the lethality of the weapon used.[74] Because assault is an offense divided into degrees, Section 274 made it mandatory for the jury to decide what degree of that offense was consistent with Johnson's mental state.

■ The jury was required to distinguish Johnson's liability as an accomplice for the offense of assault—an analysis that incorpo-

rates Section 271 and the principle of reasonable foreseeability—from Johnson's culpability for the degree of assault. The latter determination would have depended upon the jury's assessment of Johnson's *own* "culpable" mental state and accountability for any aggravating fact or circumstance as required by Section 274. The Superior Court permitted the State to proceed under Section 271 on an accomplice liability theory with regard to the felonious assault count in the grand jury indictment, i.e., an offense divided into degrees. Thereafter, it was reversible error for the Superior Court to deny Johnson's request for a jury instruction in accordance with the statutory mandate of Section 274.[75]

### *Lesser Included Offenses*
### *Record Support and Section 274*

■ The Superior Court's instructions to Johnson's jury recited the relevant elements of first-degree assault and partially recited the relevant elements of second-degree assault.[76] On appeal, Johnson argues that it was reversible error for the Superior Court not to give a full instruction on the lesser-included offenses of second- and third-degree assault. According to Johnson, because there was evidence from which the jury could have found that Woodward suffered no "serious physical injury," the jury could rationally have acquitted him of first-degree assault and instead convicted him of one of the lesser offenses.

The various degrees of assault differ, at least in part, depending on whether the victim has suffered a "serious physical injury." The Delaware Criminal Code defines "serious physical injury" as:

> physical injury which creates a substantial risk of death, or which causes serious and prolonged disfigurement, prolonged impairment of health or prolonged loss or

---

72. *Chance v. State,* 685 A.2d at 357.

73. *See Chance v. State,* 685 A.2d at 359.

74. *See* 11 *Del.C.* §§ 611–613.

75. *Cf. Chance v. State,* 685 A.2d at 359–60.

76. The Superior Court instructed the jury that Johnson could be convicted of second-degree assault if it found that he recklessly or intentionally caused serious physical injury to the victim. A conviction of second-degree assault is also appropriate, however, where the defendant causes only physical injury but does so with a deadly weapon. *See* 11 *Del.C.* § 612(a)(2).

impairment of the function of any bodily organ.[77]

The State did not contend that Woodward's injuries created a risk of death or that they caused a prolonged impairment of health or the function of a bodily organ. Therefore, whether a serious physical injury occurred, pursuant to the statutory definition, required the jury to evaluate the severity and duration of Woodward's disfigurement.

According to Johnson, the evidence at trial showed that the scarring from Woodward's reconstructive surgery would be minimal or might disappear entirely, except for a scar over the bridge of Woodward's nose. Thus, Johnson contends that a jury could rationally have found that Woodward suffered no serious physical injury. Therefore, Johnson submits this evidence would have provided a basis for acquitting Johnson of first-degree assault and instead convicting him of either lesser offense.

 A defendant is entitled to an instruction for a lesser-included offense when "[t]here is a rational basis in the evidence for a verdict acquitting [a] defendant of the offense charged and convicting him [or her] of the included offense."[78] The record reflects that there was a rational evidentiary basis in the record to support Johnson's request. Moreover, as discussed earlier in this opinion, a defendant charged as an accomplice, for committing an offense that is divided into degrees, is entitled to have the jury make an individual determination of his or her mental culpability and accountability.[79] That task could only be discharged properly at Johnson's trial if the Superior Court instructed the jury as to all lesser-included offenses of assault.

### Prosecutor's Closing Argument Remarks Without Evidentiary Basis

 During his closing argument to the jury, the prosecutor commented on the failure of the victim, Woodward, to testify at trial.

> Three other people gave a statement. Where are those three other people? Where do you think they are? Where is Edward Woodward? Can you blame him for not coming here even if he still lives in Delaware after what happened to him for doing nothing? For doing nothing? Can you blame him for not wanting to come in here, sitting on this stand and pointing the finger? [The] State doesn't blame him.

Johnson's trial attorney did not object to these comments. Instead, he argued that there was no evidence that witnesses were intimidated or otherwise induced to be absent from the trial. Johnson's appellate attorney argues that the prosecutor's comments amounted to plain error.

 Attorneys must be afforded certain flexibility in making closing arguments to a jury. "The prosecutor in his final summation should not be confined to a repetition of the evidence presented at trial. He is allowed and expected to explain all the legitimate inferences of the appellants' guilt that flow from that evidence."[80] Such advocacy is not without limitations.[81]

This Court has approved, *inter alia*, the following standards of the American Bar Association Project on Standards for Criminal Justice:

5.8 Argument to the jury.

(a) The prosecutor may argue all reasonable inferences from evidence in the record. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.

(b) It is unprofessional conduct for the prosecutor to express his [or her] personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant.

---

**77.** 11 *Del.C.* § 222(22).

**78.** *Webb v. State*, Del.Supr., 663 A.2d 452, 462 (1995) (quoting 11 *Del.C.* § 206(c) (certain alterations in original)).

**79.** 11 *Del.C.* § 274.

**80.** *Hooks v. State*, Del.Supr., 416 A.2d 189, 204 (1980). *See also DeAngelis v. Harrison*, Del. Supr., 628 A.2d 77, 80 (1993).

**81.** *Hooks v. State*, Del.Supr., 416 A.2d at 204.

(c) The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury.

\* \* \* \* \* \*

5.9 Facts outside the record.

It is unprofessional conduct for the prosecutor intentionally to refer to or argue on the basis of facts outside the record whether at trial or on appeal, unless such facts are matters of common public knowledge based on ordinary human experience or matters of which the court may take judicial notice.[82]

In Johnson's case, the prosecutor's remarks to the jury about Woodward's absence from trial did not comport with these well-established standards for closing arguments. It is unnecessary for this Court to decide the magnitude of harm caused by those isolated remarks, however, since we have already concluded that Johnson is entitled to receive a new trial.[83]

### *Conclusion*

The judgments of conviction are reversed. This matter is remanded for a new trial in accordance with this opinion.

---

**82.** *Sexton v. State,* Del.Supr., 397 A.2d 540, 544–45 n. 1 (1979) (quoting ABA Standards, The Prosecution and Defense Functions §§ 5.8, 5.9 (Approved Draft 1971)).

**83.** *Cf. Black v. State,* Del.Supr., 616 A.2d 320 (1992).