IN THE SUPREME COURT OF THE STATE OF DELAWARE

COREY S. REYES,                 §
                                §   C.A. No. 232, 2023
    Defendant Below,            §
    Appellant,                  §
                                §   Court Below—Superior Court
                                §   of the State of Delaware
    v.                          §
                                §   Cr. ID No. 2208005427
STATE OF DELAWARE,              §
                                §
    Appellee.                   §


Submitted: January 17, 2024
Decided:   April 8, 2024

Before **SEITZ**, Chief Justice, **LEGROW** and **GRIFFITHS**, Justices.

Upon appeal from the Superior Court of the State of Delaware. **AFFIRMED.**

Elliot Margules, Office of Defense Services, Wilmington, Delaware, *for Appellant Corey S. Reyes.*

John R. Williams, Delaware Department of Justice, Dover, Delaware, *for Appellee State of Delaware.*


**GRIFFITHS**, Justice:

This appeal stems from an altercation between appellant Corey Reyes and his girlfriend at the time, Jennifer Deems, and his subsequent arrest, both of which happened in the span of a few hours on August 10, 2022. After a three-day trial, Reyes was found guilty of second-degree assault, as well as resisting arrest with force or violence and disorderly conduct. Reyes raises two issues on appeal. First, he argues that an amendment to his indictment was one of substance and thus impermissible. Second, he argues that the prosecution made statements that rise to the level of prosecutorial misconduct such that they affected the integrity of the trial process and his substantive rights.

We find that the amendment to Reyes's indictment during trial was one of form rather than substance, and we therefore AFFIRM his conviction of resisting arrest with force or violence. We also find that any error arising from the prosecutor's misconduct was harmless. Although certain comments were improper, they were not illustrative of a pattern of repetitive misconduct over multiple trials, and we therefore AFFIRM Reyes's conviction of second-degree assault.

## I.     FACTUAL AND PROCEDURAL BACKGROUND[1]

The events leading to Corey Reyes's eventual indictment took place on August 10, 2022 in Dover, Delaware. That day, Reyes and Deems were hanging out

---

[1] The facts are drawn from the record below.

with friends around his sister's house.[2] Deems's and Reyes's accounts at trial about the events of the day diverged almost immediately.

Deems testified that the pair got into an argument, and Reyes told Deems to go back to their shared rental home.[3] Reyes testified that Deems showed up to drop off some cigarettes, she stayed for ten or fifteen minutes, and he then told her to leave due to police activity in the area that day.[4] Deems stated that the pair continued to argue.[5] Reyes testified that the two had an argument about Deems not cooking dinner, and he told her that "if you're not going to cook, then I'm going to find someone else to cook."[6] Deems testified that the argument continued to escalate and "it turned into that he was going to be bringing another female into [her] house" and she "told him that wasn't happening."[7] She eventually left the house with her three-year-old son to pick up cigarettes.[8]

When Deems returned to their home, she parked on a side street in the hopes of being able to run in and out of the house to grab diapers for her son without being seen.[9] She left her son in the car with the intention of going into the house only

---

[2] App. to Opening Br. at A28 (Testimony of Jennifer Deems); *id.* at A85 (Testimony of Corey Reyes).
[3] *Id.* at A27–A28 (Testimony of Jennifer Deems).
[4] *Id.* at A86 (Testimony of Corey Reyes).
[5] *Id.* at A28 (Testimony of Jennifer Deems).
[6] *Id.* at A86 (Testimony of Corey Reyes).
[7] *Id.* at A28 (Testimony of Jennifer Deems).
[8] *Id.*
[9] *Id.*

briefly.[10]  Deems testified that she walked inside, heard footsteps, and that Reyes blocked the doorway.[11]  She then described how Reyes proceeded to harm her:

> Well, I was put in a headlock.  Also thrown over the back of my couch and fell off of that[,] which had then caused me [to] fall[] down on top of my leg and him falling down on top of me.  I had still tried to fight him off. . . .  [W]hile trying to get away, I wound up getting my shirt and bra ripped off of me.  Then eventually I gave up.  I couldn't fight anymore.[12]

She told the jury that Reyes put her in a headlock—during which she could not breathe for three seconds—and that she kept screaming that "the baby was in the car" and to let her go get him.[13]  She testified that during the time she was trying to fight him off, she "was being pulled by [her] hair" and was "dragged around."[14]

Deems also told the jury how she injured her leg when she was trying to get out of the house:

> I had tried to run for the front door and he had grabbed me and I flipped backwards over the couch and rolled over because it's in front of the front door. . . . The second time I had hit the floor, I heard [the bottom half of my leg] snap.[15]

---

[10] *Id.* at A30 (Testimony of Jennifer Deems).
[11] *Id.* at A28 (Testimony of Jennifer Deems).
[12] *Id.*
[13] *Id.* at A29 (Testimony of Jennifer Deems).
[14] *Id.*
[15] *Id.*

4

She told the jury that Reyes was trying to make her sit up and was telling her that her leg was not broken.[16] She also testified that she could not stand up by herself and that Reyes eventually forced her to sit up on the couch while he went outside to get Deems's son out of the car.[17] When she sat up, she said that she could see her "bone sticking up from [her] leg."[18] She stated that she "kicked into survival mode and [] tried to escape" by running out of the house.[19] When she realized she could not run on her leg, she "basically threw [her]self off the front step into the grass and army crawled over" to her neighbor Alicia Carter's house.[20] She testified that when she got to Carter's house, she "started screaming and banging on her door telling her to call the cops."[21]

Reyes, for his part, recalled the altercation differently. He testified that Deems came storming into the house looking for a woman and burst through the front door.[22] He testified that he was the only person in the house.[23] He told the jury that Deems tried to get past him to go farther inside, and that, in an effort to block her from doing so, he pushed her but did not shove her.[24] Eventually, he picked her up

---

[16] *Id.*
[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] *Id.*
[21] *Id.*
[22] *Id.* at A87 (Testimony of Corey Reyes).
[23] *Id.* at A88 (Testimony of Corey Reyes).
[24] *Id.* at A87–A88 (Testimony of Corey Reyes).

in order to sit her down on the couch to prevent her from damaging anything in the house:

> So this would be the third time that she didn't try to like slide through me, go around me, under me. Every which way you could try to imagine, she tried to do. So this time, with my forearm like this [], and I'm standing in front of [her], I kind of picked [her] up like a baby. . . . [b]y the waist and I walked with her. It was no pick-up, it was like a walk. And I set her down. I said, "Can you stop trying to mess up-- f-up my couch." And she wouldn't listen.[25]

Reyes stated that Deems continued to be irate about the possibility of another woman in the house, and that after he set her down on the couch she came right back at him.[26] He denied dragging her around by her hair, falling on top of her, or choking her.[27]

Reyes also testified that Deems came at him again and "[t]hat's when [he] did the same move, but this time she fell out, like dead, like an alligator spin type and sat on the ground. She didn't want [him] to pick her up and put her back."[28] He said Deems was able to get back up and that she proceeded to tell him that her son was in the car.[29] At that point, he said he went outside to go get him, and when he got her son settled in the house, he went back outside after hearing a loud noise.[30] Reyes

---

[25] *Id.* at A88–A89 (Testimony of Corey Reyes).
[26] *Id.* at A89 (Testimony of Corey Reyes).
[27] *Id.*; *see also id.* at A91 (Testimony of Corey Reyes).
[28] *Id.* at A89 (Testimony of Corey Reyes).
[29] *Id.*
[30] *Id.* at A90 (Testimony of Corey Reyes).

testified that he saw Deems next door, shirtless and crawling.[31]  He said that Deems was telling him to leave her alone and that she didn't say anything about her leg.[32]

Alicia Carter, Reyes's neighbor, testified that she heard Deems sobbing on her porch and saying that her leg was broken.[33]  She opened her door and gave Deems a shirt.[34]  Carter recalled that Deems asked her to call the police, which she declined to do.[35]  Carter told the jury that Reyes then came outside and told her not to believe what Deems was telling her because Deems was making it up and was on drugs.[36]  Deems testified that Reyes told Carter that she was "a coked out crazy white girl."[37]  Carter offered to drive her to the emergency room, and she ended up taking Deems to Kent General Hospital.[38]  Deems told Carter that Reyes broke her leg.[39]  When Carter returned home, Reyes told her that he did not do anything to Deems.[40]

That evening, Officer Siobhan Burton of the Dover Police Department was dispatched to Kent General Hospital after "receiv[ing] a call from a nurse that there

---

[31] *Id.*
[32] *Id.*
[33] *Id.* at A24 (Testimony of Alicia Carter).
[34] *Id.*
[35] *Id.*
[36] *Id.* at A24–A25 (Testimony of Alicia Carter).
[37] *Id.* at A30 (Testimony of Jennifer Deems).
[38] *Id.* at A25–A26 (Testimony of Alicia Carter); *see also id.* at A34 (Testimony of Officer Siobhan Burton).
[39] *Id.* at A25, A26 (Testimony of Alicia Carter).
[40] *Id.* at A26 (Testimony of Alicia Carter).

was an assault that happened that appeared to be domestic related."[41] Upon entering Deems's hospital room, Burton testified that Deems was "hysterical[ly] crying, very upset," that her body "was tense," and that Deems was saying she was in pain and that her leg hurt.[42] She stated that Deems told her that she had gotten into a "verbal argument" with Reyes that "kind of escalated into a physical argument which occurred inside of [Deems's] residence."[43] Burton also told the jury that Deems told her that Reyes had choked her and threatened to kill her.[44] Burton observed that Deems's neck "was red and had scratches on it" and that "her left leg was swollen."[45] The emergency room doctor who treated Deems, Dr. Robert Baeder, testified that he noticed an "obvious injury" to Deems's leg.[46]

Shortly after returning to the police station, Burton determined that she was going to arrest Reyes and returned to his home that evening with additional officers—Samuel Seibert, Chase Strickland, Max Alderson, Jake Shepherd, and Officer Guiteras—to assist with the arrest.[47] She testified that the Dover Police Department's common practice is to bring backup when effecting an arrest.[48] Here,

---

[41] *Id.* at A34 (Testimony of Officer Siobhan Burton).
[42] *Id.*
[43] *Id.*
[44] *Id.* at A34–A35 (Testimony of Officer Siobhan Burton).
[45] *Id.* at A34 (Testimony of Officer Siobhan Burton).
[46] *Id.* at A79 (Testimony of Doctor Robert Baeder).
[47] *Id.* at A35–A36, A43 (Testimony of Officer Siobhan Burton).
[48] *Id.* at A35, A43 (Testimony of Officer Siobhan Burton); *see also id.* at A47 (Testimony of Officer Samuel Seibert).

8

Burton decided to bring the number of officers that she did—six including herself—because of the nature of the alleged altercation, Reyes's size (he is 6'11"), the fact that he was in a home with multiple entrances and exits, and her lack of knowledge as to whether other people or a firearm were inside the residence.[49]

Officer Burton arrived at the house in uniform and in a fully-marked Dover Police Department vehicle.[50] Once there, she and the other officers discussed how they would position themselves to attempt Reyes's arrest safely.[51] Burton testified that she knocked on the door, identified herself as a police officer, and asked for Corey.[52] He did not come outside despite repeated requests from the officers.[53] Reyes told the jury that he could not hear the officers speaking to him from inside his home because the television was on and other people were talking inside the house, including some of his family members.[54]

Officer Burton testified that Reyes eventually came out of the house after a few minutes and that he was yelling at her and Patrolman Seibert as they approached.[55] She told that the jury that Reyes was tense, smelled of alcohol, and that he refused to put his hands behind his back after they told Reyes that they had a

---

[49] *Id.* at A36, A43 (Testimony of Officer Siobhan Burton).
[50] *Id.* at A36 (Testimony of Officer Siobhan Burton).
[51] *Id.*
[52] *Id.*
[53] *Id.*
[54] *Id.* at A92 (Testimony of Corey Reyes).
[55] *Id.* at A36 (Testimony of Officer Siobhan Burton); *see also id.* at A47 (Testimony of Officer Samuel Seibert).

warrant for his arrest.[56]  Reyes, for his part, testified that he heard the officers tell

him they had a warrant for his arrest, told them he wanted to see it, and tried to

defend himself when they tried to grab him.[57]  He said that the officers would not

talk to him, and that he told them to back up because several officers were hovering

over him.[58]

Officer Burton described the struggle that ensued:

> I grab his left arm.  Officer Seibert grabs his right arm.
> Again, [Reyes was] refusing to comply with what we're
> saying.  As Officer Seibert tried to grab his arm, he pushes
> against Officer Seibert.  Other officers, again – when we
> cover all entrances and exits, other officers come.
> [Officer] Alderson comes around from the side of the
> house, runs up with his taser out[,] at which point [Reyes]
> tries to g[r]ab his taser reaching for his taser.  We call it a
> high-low technique.  It's essentially like a hug.  You try to
> hug him to gain compliance using the least non-force
> necessary.  And then all of the officers fell off of the stoop
> because this is a front door of the residence.  So it was []
> – I would say about like six steps, brick steps leading up
> to the front door.  So it was a pretty high-elevated surface.
> And we all kind of tumbled off of that al[l][ ]together. . . .
> We did continue to – the only way I can really describe is
> grapple, wrestle.  Because he continued to not give us his

---

[56] *Id.* at A36, A44 (Testimony of Officer Siobhan Burton).
[57] *Id.* at A93 (Testimony of Corey Reyes).
[58] *Id.* at A93 (Testimony of Corey Reyes).

hands as everyone was on the ground. But eventually with two dry stuns[59] from a taser he was taken into custody.[60]

Reyes told the jury that he did not recall reaching for an officer's taser and that he remembered being tased approximately four or five times.[61] He also stated that it was not his intent to harm anyone, damage any property, threaten anyone's life, or refuse to go with the officers.[62]

Burton testified that as a result of the struggle, her flashlight was broken, Officer Strickland's watch was broken, and Officer Shepherd's pants were ripped.[63] She noted that she was not injured.[64] Officer Seibert testified that he sustained injuries—a small abrasion to his left ring finger that left a scar.[65] Officer Shepherd also testified that he sustained injuries—to his "left pinky knuckle as well as scrapes

---

[59] Officer Burton described to the jury what a "dry stun" (also referred to as a "drive stun") from a taser is: "So our taser carriers probes and then a dry stun. So when you deploy the probes, it's the electricity going from the probe – because the probes go out. So it's from one point to another point. The wider the spread, the more electricity that runs through. A dry stun is just localized. It's very, very small. Nothing gets deployed. It's just with the taser. Nothing, like, sticks at your skin or anything like that. It's essentially pain compliance. Not neuromuscular tension." App. to Opening Br. at A37 (Testimony of Officer Siobhan Burton); *see also id.* at A48–49 (Testimony of Officer Samuel Seibert) (describing the mechanics of a dry stun).

[60] *Id.* at A36–A37 (Testimony of Officer Siobhan Burton); *see also id.* at A44; *id.* at A47–48, A52 (Testimony of Officer Samuel Seibert); *id.* at A55–56, A58 (Testimony of Officer Jake Shepherd); *id.* at A61 (Testimony of Officer Max Alderson); A65 (Testimony of Officer Chase Strickland).

[61] *Id.* at A93 (Testimony of Corey Reyes).

[62] *Id.* at A93–94 (Testimony of Corey Reyes).

[63] *Id.* at A37 (Testimony of Officer Siobhan Burton); *see also id.* at A56 (Testimony of Officer Jake Shepherd); *id.* at A63–64 (Testimony of Officer Chase Strickland).

[64] *Id.* at A38, A45 (Testimony of Officer Siobhan Burton).

[65] *Id.* at A49–A50, A52 (Testimony of Officer Samuel Seibert).

to [his] right knee and left elbow.[66]  Officer Strickland likewise testified that his left forearm was "bruised and bloody," along with his left knee due to the arrest.[67]

After his arrest, Reyes was taken to the Dover Police Department.[68]  When asked about the videotaped statements he made at the station, during which he threatened to "fuck someone up" and that "if anyone comes for his house and his son, that [he was] going to go ham," he testified that he did not remember making the statements and that it was not his intent to harm anyone.[69]  He told the jury that in that moment he felt violated and was frustrated that the police did not speak with him at his house about the warrant.[70]

Reyes was indicted on October 3, 2022.[71]  He was reindicted by the grand jury on February 3, 2022 for four counts of second-degree assault, strangulation, resisting arrest with force or violence, terroristic threatening, endangering the welfare of a

---

[66] *Id.* at A56 (Testimony of Officer Jake Shepherd).
[67] *Id.* at A64 (Testimony of Officer Chase Strickland).
[68] *Id.* at A94 (Testimony of Corey Reyes).
[69] *Id.* at A94–95 (Testimony of Corey Reyes).
[70] *Id.* at A95 (Testimony of Corey Reyes) ("I just felt violated.  I felt violated with somebody that you supposed to trust coming to my house.  If you say you have something, you know, I expect to see it. You can talk to people, other than immediately putting hands on somebody.  When you come to somebody's house, 100 people and you, your presence at somebody's house, and you automatically lunge forward and say you have a warrant, that's -- I don't know how everybody else feel[s], but I don't feel -- I feel some type of way.  Now, if you came by yourself, trust and believe I could have talked to you.  If you two people, you know, they don't take on me to come to somebody's house and tell you, you have a warrant, and -- because, you know, I was being reasonable with everybody but -- and there's officers there that know me.").
[71] *Id.* at A1.

child, three counts of criminal mischief, and disorderly conduct.[72]  A three-day jury trial was held from February 20 to February 22, 2023.[73]  The State called eight witnesses, including Jennifer Deems, Alicia Carter, Dr. Robert Baeder, Officer Siobhan Burton, Officer Samuel Seibert, Officer Jake Shepherd, Officer Max Alderson, and Officer Chase Strickland.  The State also played video footage of Reyes's arrest obtained from body cameras worn by Officers Burton, Seibert, and Strickland.[74]

During the prayer conference, the trial judge pointed out a discrepancy in the statutory subsection cited in the indictment for the resisting arrest charge.[75]  The State conceded that the citation was erroneous, and Reyes's counsel did not oppose the State's request to amend the indictment to correct that issue.[76]  On February 22, 2023, the jury found Reyes guilty of second-degree assault of Deems, resisting arrest with force, and disorderly conduct.[77]

On April 6, 2023, the State filed a motion to declare Reyes a habitual offender.[78]  On June 1, 2023, the Superior Court granted the State's motion and

---

[72] *Id.* at A7–A15 (Reindictment of Corey Reyes).  The charge of endangering the welfare of a child was later dropped at trial.  *See id.* at A76–A77.

[73] *See id.* at A12–A170 (Trial Transcript).

[74] *See* App. to Opening Br. at A43 (Testimony of Officer Siobhan Burton); *id.* at A50 (Testimony of Officer Andrew Seibert); *id.* at A64 (Testimony of Officer Chase Strickland).

[75] *Id.* at A67.

[76] *Id.* at A68.

[77] *Id.* at A1, A4.

[78] *Id.* at A4.  The State filed an amended motion on May 31, 2023.

13

sentenced Reyes to seventy years and one month incarceration at Level V, suspended after thirty-five years and twenty days, followed by probation.[79]  Reyes appealed his convictions on June 28, 2023.

## II.    STANDARD OF REVIEW

We review the Superior Court's decision on a motion to amend an indictment for abuse of discretion.[80]  We review claims of a constitutional violation *de novo*.[81]

"Where defense counsel fails to raise a timely and pertinent objection to alleged prosecutorial misconduct at trial and the trial judge does not intervene *sua sponte*, we review only for plain error."[82]  We first determine *de novo* whether the prosecutor's actions rise to the level of misconduct.[83]  If we determine that no misconduct occurred, our analysis ends there.[84]  But if we find that there was prosecutorial misconduct, then we proceed to a plain error analysis under *Wainwright v. State*.[85]  "If we conclude that the misconduct would not warrant reversal under the *Wainwright* standard, we proceed to apply our analysis in *Hunter*

---

[79] *See id.* at Ex. B (Corrected Sentence Order for Corey Reyes).

[80] *Kent v. State*, 2021 WL 4393804, at *5 (Del. Sept. 24, 2021) (quoting *Cuffee v. State*, 2014 WL 5254614, at *2 (Del. Oct. 14, 2014)).

[81] *See Zebroski v. State*, 12 A.3d 1115, 1119 (Del. 2010).

[82] *Baker v. State*, 906 A.2d 139, 150 (Del. 2006) (citations omitted); *see also Saavedra v. State*, 225 A.3d 364, 372 (Del. 2020) (citation omitted) ("When we consider prosecutorial-misconduct claims, our standard of review frequently depends on whether the defendant objected to the alleged misconduct at trial.  If the defendant did not object, this Court reviews only for plain error; if he did object, then we review for harmless error.").

[83] *Saavedra*, 225 A.3d at 372 (citing *Baker*, 906 A.2d at 149–150).

[84] *Id.*

[85] *Id.*; *see also Wainwright v. State*, 504 A.2d 1096, 1100 (1986).

*v. State* as the third analytical step, and we consider whether the prosecutor's statements are repetitive errors that require reversal because they cast doubt on the integrity of the judicial process."[86]

### III.  ANALYSIS

Reyes argues that his resisting arrest conviction should be reversed because the amendment made to his indictment during trial was substantive and thus impermissible.  He also argues that his second-degree assault conviction should be reversed because the statements the prosecutor made on direct examination of Deems and during closing argument constituted prosecutorial misconduct that was so prejudicial to his substantial rights that it jeopardized the fairness and integrity of the trial process.  We address these allegations of error in turn.

### A.     *The Amended Indictment Did Not Violate Reyes's Constitutional Rights*

Reyes first argues that the amendment to his charge of resisting arrest with force or violence was impermissible because the change was one of substance rather than one of form.  Under Superior Court Rule of Criminal Procedure 7(e), the court may permit an indictment to be amended "at any time before verdict or finding if no additional or different offense is charged and if substantial rights of the defendant are not prejudiced."[87]  Thus, a trial court is permitted to authorize an amendment

---

[86] *Trala v. State*, 244 A.3d 989, 998 (Del. 2020).
[87] Super. Ct. Crim. R. 7(e).

that corrects a mistake of form that will not result in substantial harm or prejudice to a defendant.[88]  A trial court is not, however, permitted to authorize an amendment to an indictment if it would alter the substance of the grand jury's charge in any way.[89]  The test for whether an indictment amendment is appropriate under the Delaware Constitution is centered on "the extent to which the amendment substantively changes the material elements of the crime alleged in the original indictment."[90]  Here, we review only for plain error, as this issue was not raised below.[91]  We find plain error only for "material defects which are apparent on the face of the record, which are basic, serious, and fundamental in their character, and which clearly deprive an accused of a substantial right, or which clearly show manifest injustice."[92]

Reyes's indictment was amended to correct a mistake of form that amounted to a scrivener's error.  In Reyes's original indictment, the count at issue reads as follows:

> RESISTING ARREST WITH FORCE OR VIOLENCE, a felony, in violation of Title 11, **Section 1257(a)(3)** of the Delaware Code of 1974 as amended.

---

[88] *Coffield v. State*, 794 A.2d 588, 591 (Del. 2002).
[89] *Id.* (citing *Johnson v. State*, 711 A.2d 18, 26 (Del. 1998) (citing *State v. Blendt*, 120 A.2d 321, 324 (Del. Super. 1956))).
[90] *Id.* at 592.
[91] *See Bordley v. State*, 224 A.3d 575 (Del. 2020) (citing *Zhurbin v. State*, 104 A.3d 108, 113 (Del. 2014)).
[92] *Baker*, 906 A.2d at 150.

COREY REYES on or about the 10th day of August, 2022, in the County of Kent, State of Delaware, did intentionally attempt to prevent Pfc. Burton of the Dover Police Department, from effecting an arrest or detention of himself by use of force or violence toward Pfc. Burton.[93]

Section 1257(a), states, in relevant part:

(a) A person is guilty of resisting arrest with force or violence when:

(1) The person intentionally prevents or attempts to prevent a peace officer from effecting an arrest or detention of the person or another person by use of force or violence towards said peace officer; or

. . .

(3) While a peace officer is effecting an arrest or detention of a person, the person causes physical injury to the peace officer.[94]

On its face, the indictment tracks the language of § 1257(a)(1), rather than § 1257(a)(3), the provision under which Reyes was indicted for resisting arrest with force or violence.

The trial judge, who recognized the inconsistency while preparing the jury instructions, raised the issue with counsel and asked the State whether it intended to move to amend the indictment to change the provision of § 1257(a) to (1) from (3).[95] Defense counsel, confirming that the change would reflect the correction of a

---

[93] App. to Opening Br. at A9 (emphasis added).
[94] 11 *Del. C.* § 1257(a)(1), (3).
[95] *See* App. to Opening Br. at A67–A68.

17

scrivener's error, did not oppose the State's application to correct the indictment.[96] Though Reyes claims the amendment was "clearly" an amendment of substance because it changed the material elements of the crime alleged in the original indictment, at oral argument, his counsel agreed that the correction of the indictment was technical in nature and that the indicted crime matched the trial evidence.[97] Accordingly, we find no error; the amendment made to Reyes's resisting arrest charge with force or violence was one of form and did not violate any of his constitutional rights.[98]

The above said, it is paramount to carefully draft indictments to avoid issues such as this one on appeal. Over forty years ago in *Malloy v. State*,[99] we directed the Attorney General to review "the internal practices and procedures employed in the preparation of indictments . . . with particular attention to quality and uniformity of draftsmanship" to avoid the waste of legal resources related to hastily prepared indictments.[100] Today, we underscore that charge.

---

[96] *Id.* at A68.

[97] Delaware Supreme Court, *Oral Argument Video*, Vimeo, at 1:56–3:21, 4:05–4:36 (January 17, 2024) https://vimeo.com/901573657.

[98] For its part, the State argues that because Reyes's counsel did not object, but rather seemed to bless, the State's motion to amend the indictment, Reyes waived the right to argue on appeal that the amendment was substantive even under plain error review. *See* Answering Br. at 28–29. We disagree that plain error review is precluded here, but in any case, there is no error.

[99] 462 A.2d 1088 (1983).

[100] *Id.* at 1094.

## B. *The Prosecution's Improper Statements Were Not Plain Error*

Next, Reyes claims that the prosecution made approximately a dozen improper statements—one during Deems's direct examination and the others during closing argument. These statements, Reyes argues, fall into six categories of improper conduct: (1) impermissible use of propensity evidence; (2) expression of personal opinions about Reyes's guilt; (3) misrepresentation of the record; (4) impermissible vouching for Deems; (5) appealing to the jury's biases and sympathies; and (6) impermissible bolstering of Deems's credibility. Reyes argues that collectively or individually, they amount to prosecutorial misconduct so prejudicial that it interfered with his substantial rights and jeopardized the fairness and integrity of his trial. For the reasons stated below, we disagree.

Though some of the prosecutor's statements were improper, the instances of prosecutorial misconduct did not amount to plain error under *Wainwright*, nor were they persistent across multiple trials, such that we would be required to reverse Reyes's conviction under *Hunter*. Below we analyze the statements by category, and then explain why neither standard is met here.

### 1. *Some of the Prosecutor's Statements Were Improper*

We find that certain of the prosecution's statements during closing argument amounted to prosecutorial misconduct. We review such claims *de novo* to determine

whether the conduct was improper or prejudicial.[101]  Not every improper remark

requires reversal.[102] Critically, "[w]hen deciding whether a comment is improper

prosecutorial misconduct, our cases often turn on the nuances of the language and

the context in which the statements were made."[103] And though we do not have an

all-encompassing definition of prosecutorial conduct,[104] we have several guide

posts, including our case law and the American Bar Association's Criminal Justice

Standards for the Prosecution Function.[105]

Two of these standards—"Presentation of Evidence" and "Closing Arguments

to the Trier of Fact"—are of particular import here.  They advise prosecutors to "not

bring to the attention of the trier of fact matters that the prosecutor knows to be

inadmissible."[106] They also advise prosecutors to avoid certain practices during

closing argument:

---

[101] *See Kurzmann v. State*, 903 A.2d 702, 708 (Del. 2006) (citing *Flonnory v. State*, 893 A.2d 507, 538 (Del. 2006) (citations omitted).
[102] *See id.* at 708–09 (Del. 2006) (quoting *Daniels v. State*, 859 A.2d 1008, 1011 (Del. 2004)).
[103] *Id.* at 710.
[104] *See Watson v. State*, 303 A.3d 37, 44 & n.30 (Del. 2023).
[105] *See generally Crim. Justice Standards for the Prosecution Function*, AM. BAR ASS'N (2017), https://www.americanbar.org/groups/criminal_justice/standards/ProsecutionFunctionFourthEditi on/.
[106] *Crim. Justice Standards for the Prosecution Function Standard* 3–6.6, AM. BAR ASS'N (2017), https://www.americanbar.org/groups/criminal_justice/standards/ProsecutionFunctionFourthEditi on/.

- "The prosecutor should not knowingly misstate the evidence in the record, or argue inferences that the prosecutor knows have no good-faith support in the record."[107]

- "The prosecutor should scrupulously avoid any reference to a defendant's decision not to testify."[108]

- "The prosecutor should not argue in terms of counsel's personal opinion, and should not imply special or secret knowledge of the truth or of witness credibility."[109]

Reyes argues that the prosecutor engaged in most of these frowned-upon practices while making her closing argument. We agree with Reyes in part; some of the statements were improper and amount to prosecutorial misconduct.

### a. The Prosecution Did Not Impermissibly Put Propensity Evidence Before the Jury

Reyes first argues that during closing argument, the prosecutor impermissibly encouraged the jury to consider his statements and conduct during his arrest as "propensity evidence of his state of mind" during the earlier incident with Deems.[110] Specifically, Reyes asserts that "the prosecution asked the jury to employ a classically impermissible propensity argument by suggesting the behavior and attitude the jury *observed* in videos of the second incident[] was evidence of [his]

---

[107] *Crim. Justice Standards for the Prosecution Function Standard* 3–6.8(a), AM. BAR ASS'N (2017), https://www.americanbar.org/groups/criminal_justice/standards/ProsecutionFunctionFourthEdition/.

[108] *Id.*

[109] *Id.*

[110] Opening Br. at 15.

21

intentions [] in the first."[111]  Reyes argues the following excerpt from the prosecutor's closing argument demonstrates that she used propensity evidence inappropriately:

> [Reyes] told you he really doesn't have any idea what happened.  He heard some type of loud thump outside.  Next thing he knows Jennifer is crawling around on the ground, she's screaming, she's running away from him like it's a scary movie, and she is naked from the waist up.  He just has no idea how any of this could have happened.  None.  He's the calm one.
>
> Let's talk dramatic.  You know who is actually dramatic here, [Reyes].  You have body cam footage that you will be able to watch while you deliberate.  This man is screaming before the cops -- before the cops even see him, he's inside his house screaming.  This is the man who came outside when his girlfriend is injured and is screaming again, crazy coked-out, white bitch, don't believe her, she's making this up.  This is the man who goes up to his girlfriend when she's clearly in pain and distraught and rips a necklace off of her.  I mean, talk about dramatic.
>
> This is also the man who, when he finally does open the door for the police, he's the one screaming, he's the one screaming profanities.  He's the one who turns it physical when [Officer] Seibert reaches out for him to place him under arrest and he shoves him away.  And you get to watch that again on body cam.  [Reyes] is the one who is throwing his body around, who is trying to grab an officer's taser, who is grabbing an officer's head, who is moving around and acting so out of control that six officers cannot place him into custody.  They cannot put handcuffs on him.

---

[111] *Id.* at 15–16.

> This is the same person who later on is telling the police, I don't care who shows up at my house, I will fuck each and every one of them up. I don't care who you are, I'm going to go ham.[112]

Though it is a close call, we disagree with Reyes that the State improperly used his state of mind during the arrest as evidence that he had a propensity to act with violence, anger, or an intent to harm.

Delaware Rule of Evidence 404 delineates when the use of propensity evidence is permissible. D.R.E. 404(a) states that "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait."[113] And D.R.E. 404(b) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."[114]

Here, as in our recent decision in *Watson v. State*, Reyes's contention that the prosecution used Reyes's actions during his arrest in service of a propensity argument falls short of the mark. First, like the defendant in *Watson*, Reyes "does not point to a single statement in the prosecution's summation that could fairly be characterized as misstating the law or explicitly asking the jury to infer" that his

---

[112] App. to Opening Br. at A110–A111.
[113] D.R.E. 404(a).
[114] D.R.E. 404(b).

23

behavior and attitude during his arrest demonstrates that he was disposed to act the same way during his altercation with Deems.[115]  Second, the prosecutor's reference to Reyes's actions during his arrest was "firmly embedded in [her] argument" about the numerous other charges Reyes was facing in relation to his arrest, including resisting arrest with force or violence, disorderly conduct, and second-degree assault against the officers on scene.[116]  Here, "the prosecutor's arguments, as we see them, were consistent with the jury's duty to decide the case on the evidence and did not seek to divert the jury from that duty."[117]  In this instance, we do not find the prosecutor's comments to be improper.

> b.  <u>The Prosecutor's Statements Were Not Improper Personal Opinions as to Reyes's Guilt</u>

Reyes next claims that on numerous occasions during closing argument, the prosecutor expressed her personal opinion about Reyes's guilt by using "we know" statements and employing qualifiers in her language, such as "ample," "absolutely," and "it's clear."  We have repeatedly held that it is improper for a prosecutor to express their personal beliefs or opinions as to a defendant's guilt.[118]  Doing so, especially without qualification, can jeopardize a defendant's right to a fair trial by

---

[115] *Watson*, 303 A.3d at 46.
[116] *Id.*
[117] *Id.* at 48.
[118] *See, e.g.*, *Morales v. State*, 133 A.3d 527, 530 (Del. 2016) (citing cases); *Heald v. State*, 251 A.3d 643, 655 (Del. 2021) (internal quotations and citations omitted) ("A prosecutor must avoid improper suggestions, insinuations, and assertions of personal knowledge in order to ensure that guilt is decided only on the bases of sufficient evidence.").

seriously weakening the constitutional presumption of innocence.[119]  Accordingly,

any plain statement of a defendant's guilt without qualification is improper.[120]  It is

not *per se* improper, however, to use the first person "I" or "we" in a closing

argument.[121]

Reyes argues that the following statements were improper:

- "But what *we know* from [Carter]'s testimony and from [Deems]'s testimony is that there was no concern [for Deems's safety]."[122]

- "How do *we know* that it was his conscious objective to cause serious physical injury?  He is 6 feet 11 inches tall.  His girlfriend is 5-foot five.  He drags her around the house.  He puts her in a chokehold.  He flips her over a couch.  He lands on her. And her bones are snapping audibly.  That is intentional. *Absolutely* his conscious objective to cause harm to her, to cause serious physical injury."[123]

- "There is *ample* testimony that he put her in a chokehold.  He is almost seven feet tall.  She's 5'5".  He stood behind her and he put his arm around her neck. She told you she could not breathe."[124]

---

[119] *Id.*

[120] *See, e.g.*, *Spence v. State*, 129 A.3d 212, 227 (Del. 2015) (holding that a sentence in the State's PowerPoint presentation stating that "[t]he defendant is guilty of all the charges against him" was improper because it was a personal expression about the defendant's guilt); *see also Morales*, 133 A.3d at 531 (holding that the statement "the defendant is clearly guilty of robbery" was improper because it lacked a qualifier and expressed a personal opinion as to the defendant's guilt).

[121] *See Booze v. State*, 919 A.2d 561, 2007 WL 445969, at *5 (Del. Feb. 13, 2007) (TABLE); *see also Brokenbrough v. State*, 522 A.2d 851, 859 (Del. 1987) ("We do not adopt a rule which says that the use of the word 'I' or 'we' in a closing argument is *per se* improper. . . . There is a great difference in 'leaving' a point before the jury and 'suggesting' it personally.  Nevertheless, arguments in the first person are extremely dangerous and should be assiduously avoided.").

[122] App. to Opening Br. at A105 (emphasis added).

[123] *Id.* at 106 (emphasis added).

[124] *Id.* at A108 (emphasis added).

- "He threatened Jennifer and *it's clear* that those threats, if carried out, would result in death or serious injury."[125]

We do not find any of these statements to be improper. Here, unlike in *Morales* or *Spence*, the prosecutor did not "plainly state" that Reyes was guilty. And the prosecution's statements were "not an opinion formed from whole cloth."[126] Rather, the statements "referred to the evidence introduced at trial and the legitimate inferences drawn from that evidence."[127] Accordingly, we do not find that they constitute prosecutorial misconduct.

### c. The Prosecution Improperly Misstated the Record More than Once

Reyes next argues that the prosecutor misstated the record several times during her closing argument:

- When she twice told the jury that Reyes told his neighbor, Alicia Carter, that Deems was a "coked out white bitch."[128]

- When she told the jury that Reyes "[told them] he was the calm one in the situation."[129]

- And when she told the jury that "[s]he cannot play with her kid the way that she should be able to play with her kid."[130]

---

[125] *Id.* (emphasis added).
[126] *Booze v. State*, 919 A.2d 561, 2007 WL 445969, at *5 (Del. Feb. 13, 2007) (TABLE).
[127] *Id.*
[128] Opening Br. at 18; *see also* App. to Opening Br. at A106 ("He came out of the house and what did he do? He starts screaming she's on drugs, she's a coked out crazy white bitch, she's making this all up, don't listen to what she says."); *id.* at A110–111 ("This is the man when his girlfriend and is screaming again, crazy coked-out[] white bitch, don't believe her, she's making this up.").
[129] App. to Opening Br. at A109–110; *see also* Opening Br. at 19.
[130] App. to Opening Br. at A107; *see also* Opening Br. at 19 (noting that though Deems made an identical claim at sentencing, she did not do so in her trial testimony).

"A prosecutor's duty to see that justice be done by giving [a] defendant a fair and impartial trial extends through closing arguments."[131] Though it is permissible for a prosecutor to argue all reasonable inferences from evidence in the record, "the prosecutor must not misstate the evidence or mislead the jury as to the inferences it may draw."[132]

As to the first two statements, the prosecution plainly misstated the record. During direct examination, Deems testified that Reyes told their neighbor Alicia Carter that Deems was a "coked out crazy white *girl*."[133] There is no trial testimony from Deems or anyone else that Reyes ever called Deems a "bitch." Because the prosecutor's statements misrepresented the evidence presented by the State, they were improper and the State conceded as much in its briefing and at oral argument.[134]

The latter two statements present a closer question. At closing argument, the prosecutor told the jury the following:

> [Reyes] . . . talked a lot about drama, people being dramatic. So let's dig into that. Jennifer hears bone snapping. Dramatic. She sees a bone sticking out of her leg. Dramatic. He puts her in a chokehold. He rips her shirt off. He rips her bra off. She is crawling around outside. And the defendant himself said it was like she

---

[131] *Williams v. State*, 91 A.3d 563, 2014 WL 1515072, at *3 (Del. April 16, 2014) (internal quotations and citations omitted).
[132] *Id.* (citations omitted).
[133] App. to Opening Br. at A30 (Testimony of Jennifer Deems) (emphasis added).
[134] *See* Answering Br. at 21; Delaware Supreme Court, *Oral Argument Video*, Vimeo, at 28:16–58 (January 17, 2024) https://vimeo.com/901573657. We recognize that these misstatements appear to have been inadvertent, and even the defense conceded that they were not intentional.

was running away from someone in a scary movie. And she was. Because this was her nightmare.

. . .

**By contrast, [Reyes] tells you he's the calm one in the situation. Everyone but him is dramatic.** He is the one in the house who calmly tried to diffuse the situation according to him. [Deems], she was the one slamming doors, almost breaking things. He was the calm one. He calmly picked her up by her waist. And he calmly sat her down on the couch.[135]

We conclude that these are reasonable inferences that the jury could draw from the evidence in the record. When testifying about the altercation between himself and Deems, Reyes described her as dramatic at numerous points.[136] It is thus reasonable

---

[135] App. to Opening Br. at A109–110 (emphasis added).

[136] App. to Opening Br. at A87 (Testimony of Corey Reyes) (emphasis added) ("I said, 'Why you come in here busting the door open, you know, like you own something right there? None of this is yours. **Stop your drama** and close the damn' -- I said, 'Close the f-ing door.'"); *id.* at A91 (emphasis added) ("**A.** And the mom started coming toward the door, I said, I said, 'Where [are] your clothes? Where [are] your clothes?' She didn't want to talk to me at all. She was like, 'Leave me alone, leave me alone.' I said, '**What the heck are you causing all this drama for[?]** You know, all this at one time?' So now I'm getting mad. **Q.** When you say you were getting mad, what do you mean by, you were getting mad? **A. Like she was just causing drama.** And I'm wondering - **Q.** And when you say 'drama,' what do you mean? **A.** Bringing other people into my-- like in the house. **Q.** Uh-huh. **A.** Just bringing-- everybody knows about [my house], basically. **Q.** Okay, uh-huh. **A.** And . . . when I [saw] her, the next-door neighbor was like, 'Go get me a shirt, go get me a shirt.' And so I'm trying to talk to her and she didn't want to talk. **So I'm trying to tell the next-door neighbor, I said, 'She is nothing but drama.' I said, 'Do not mind her.'** I said, 'I don't know what the heck is wrong with her.' And she was like, 'She need[s] to go to the hospital.' That's when she started talking about her leg. **Q.** Okay. At that point did you know that she had an injury to her leg? **A. No, because I'm thinking she is just screaming because, this drama, she is just causing drama.** That's what I thought. **Q.** Okay. **So your thought was that she was causing drama because you had an argument? A. Yes, yes.**").

28

to infer that he would categorize himself as calm in the situation, especially in contrast to Deems.

Similarly, though Reyes is correct that Deems never testified that she could not play with her son the way that she should be able to, it was not an unreasonable inference to make from the record. When describing the break to Deems's leg, the prosecutor told the jury the following:

> [Deems's] leg was broken in multiple places. Remember when Dr. Baeder was testifying and he had the X-ray image up and he continuously pointed out breaks in the bone in that X-ray image. Her leg was broken in multiple places. She needed surgery. She had a rod. She had a plate, four screws and a flat head pin. And she told you that those things are going to be in her leg for the rest of her life. She can't run. She can't jump. She can't kneel. She limps.
>
> She's the mother of a three-year-old. **She cannot play with her kid the way that she should be able to play with her kid.** Serious physical injury will tell you that you need prolonged impairment of the function of a bodily organ. Here, prolonged impairment of her leg. It is serious physical injury.[137]

Given the serious injuries to her leg, a reasonable juror could infer that Deems could not engage in certain physical activities, including playing with her son. We find that this statement was not improper.

> d. The Prosecution Did Not Impermissibly Vouch for Deems by Stating She Was "Remarkably" Consistent

---

[137] *Id.* at A107.

Reyes next argues that the prosecution impermissibly vouched for Deems by suggesting that the jury consider its subjective view that Deems exhibited "remarkable" consistency when testifying. Specifically, Reyes takes aim at the following statement made in closing argument: "Jennifer remained remarkably consistent from start to finish, despite this being a high-stress[], traumatic event. . . . Throughout she is consistent."[138] Reyes claims that "[d]escribing a witness's testimony as consistent is a perfectly permissible comment, but *'remarkably consistent'* is qualitatively different because it informs the jury of the prosecutor's subjective belief about the level of consistency."[139] We disagree.

Here, the use of one qualifier does not constitute an expression of the prosecutor's subjective belief that Deems testified truthfully. "Improper vouching occurs when the prosecutor implies some personal superior knowledge, beyond that logically inferred from the evidence at trial, that the witness testified truthfully."[140] It is "especially problematic when a witness'[s] credibility is at issue because jurors may easily interpret vouching by the prosecutor as an official endorsement of the witness."[141] In context, the prosecutor's statement was not objectionable. She did

---

[138] App. to Opening Br. at A101.
[139] Opening Br. at 20 (emphasis in the original).
[140] *White v. State*, 816 A.2d 776, 779 (Del. 2003); *see also Whittle v. State*, 77 A.3d 239, 243 (Del. 2013), *as corrected* (Oct. 8, 2013) ("[P]rosecutors generally cannot vouch for the credibility of a witness by stating or implying personal knowledge that the witness' testimony is correct or truthful.").
[141] *Heald v. State*, 251 A.3d 643, 652 (Del. 2021) (internal quotations and citation omitted).

30

not "say that Deems was telling the truth; [s]he said only that [Deems's] testimony was consistent with the rest of the evidence[,]" which she described in more detail during that section of her closing argument.[142]

e. The Prosecution Did Not Improperly Attempt to Influence the Jury by Appealing to their Biases and Sympathies as Parents

Reyes also argues that the prosecution impermissibly attempted to influence the jury by appealing to their biases and sympathies as parents by telling them that Deems could not play with her son in the way that she should be able to.[143] Because the injury element of the charges against him was not in dispute, Reyes contends that this "makes clear that the statement's intent here was not to prove an element of the crime through evidence, but to inflame the passions of the jury through an unsupported and high evocative description of what it wanted the jury to believe happened."[144] We find this argument to be unavailing for a few reasons.

First, as we stated above, one could reasonably infer from the record that Deems would be unable to play with her son as she should; this description is not "unsupported" and is not necessarily "highly evocative." Second, the cases that

---

[142] *Bodnari v. State*, 839 A.2d 665, 2003 WL 22880372, at *2 (Del. Dec. 3, 2003) (TABLE).
[143] *See supra* at III(B)(1)(c).
[144] Opening Br. at 20.

31

Reyes cites in support—*State v. Groves*[145] and *Piesik v. State*[146]—contain much more inflammatory statements than the one made by the prosecutor in this case.[147] The prosecutor's comparatively tempered statement does not rise to the level of being improper here. Finally, regardless of whether Reyes expressly "contested" the injury element at trial, he did not stipulate to the serious injury element and the State bears the burden of proving every element of a charge beyond a reasonable doubt. The State therefore did not act improperly by arguing to the jury that the evidence satisfied this element of second-degree assault.

f. The Prosecution Did Not Impermissibly Bolster Deems's Credibility

Lastly, Reyes argues that the prosecution impermissibly bolstered Deems's credibility through the use of prior consistent statements and by highlighting her

---

[145] 295 S.W.2d 169 (Mo. 1956).

[146] 572 P.2d 94 (Alaska 1977).

[147] *State v. Groves*, 295 S.W.2d 169, 173 (Mo. 1956) ("The [p]rosecuting [a]ttorney also stated in his closing argument: 'Send this man to five years in the [p]en. Don't let him out running around the streets 'cause if any of you have any daughters and if this defendant ever got the opportunity your daughter could be the next one, or your grandchild or something.'"); *Piesik v. State*, 572 P.2d 94, 96 n.4 (Alaska 1977) ("[The defendant] told you, [he] has done this once before, and he did it this time. And when's he going to do it again? And to whom? A lot of you are parents; a lot of you have children; and some of you are grandparents. Do you seriously want a man that does this sort of thing running around? Don't we tell our children not to talk to strangers? But do the children really know what we're talking about? Do they know the fears that we have for them; the fears that you as parents have for your children because there are people in our society that do sexually abuse children? . . . Do you want [the defendant] out there on the streets with your children? . . . . [I]s this the kind of man you want out on the streets with your 9 year old, 10 year old, your child, your neighbor's children? Even if they bounce back, is that the kind of thing you want them to be subjected to sexual assaults? Is that the kind of childhood you want young children to have in this community[?]").

apparent reluctance to testify.[148]  Reyes points to three specific instances, one that

occurred during direct examination, and two during closing argument, that he claims

were impermissible in this regard:

- "Jennifer remained remarkably consistent from start to finish, despite this being a high-stress[], traumatic event. . . . Throughout she is consistent.  So let's first talk about consistency.  The consistency is key here. . . . And who else did she tell this consistent set of facts to?  You guys."[149]

- "**Q.** Jennifer, do you want to be here today? **A.** No.  **Q.** Okay.  And why are you here?  Is it because you're under subpoena?  **A.** Yes."[150]

- "So [Deems] testified on Monday.  A couple days have gone by, obviously.  But when she testified, remember her demeanor from the stand.  She was basically cowering.  She was crying.  She was barely looking up while she explained what happened to her.  Consider demeanor on the stand when you're trying to figure out credibility of witnesses."[151]

As to the first statement, we decline to find prosecutorial misconduct occurred

for the reasons stated above, namely because the State was describing how Deems's

testimony was consistent with other record evidence.[152]  We also find that the latter

two statements, which Reyes categorizes as corroborating evidence, do not rise to

the level of misconduct.  As in *Heald*, "[t]he statements do not misstate evidence,

nor do they express or imply that the prosecutor has personal knowledge about the

---

[148] Opening Br. at 21–22.
[149] *Id.* at A101–102.
[150] App. to Opening Br. at A27.
[151] *Id.* at A125.
[152] *See supra* at III(B)(1)(d).

truth of [Deems's] testimony."[153]  In addition, "the jury was able to see [Deems's] demeanor for themselves."[154]

### 2. The Prosecutorial Misconduct Did Not Amount to Plain Error

Because we find that there was prosecutorial misconduct, we now review for plain error, given that defense counsel did not object to the challenged statements at trial and the trial judge did not intervene *sua sponte*.[155]  Under *Wainwright*, we must reverse if the error complained of is "so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process."[156]  In other words, "the error "must have affected the outcome of the trial."[157]  We weigh three factors in determining whether prosecutorial misconduct is clearly prejudicial to a defendant's substantial rights:  (1) the closeness of the case, (2) the centrality of the issue affected by the error, and (3) the steps taken to mitigate the effects of the error.  This is known as the *Hughes* test after our 1981 decision of the same name.[158]  "When more than

---

[153] *Heald v. State*, 251 A.3d at 653.
[154] *Id.*
[155] *Baker*, 906 A.2d at 148.
[156] *Wainwright*, 504 A.2d at 1100.
[157] *Keyser v. State*, 893 A.2d 956, 959 (Del. 2006) (citing *U.S. v. Olano*, 507 U.S. 725, 732–34, (1993); *Wainwright*, 504 A.2d at 1100).
[158] *Watson*, 303 A.3d at 48 (citing *Hughes v. State*, 437 A.2d 559 (Del 1981)).  As former Chief Justice Steele observed in *Baker v. State*, "[t]he factors in the *Hughes* test are not conjunctive and do not have the same impact in every case: for example, one factor may outweigh the other two. Moreover, we apply the test itself in a contextual, case-by-case, and fact-sensitive manner."  *Id.*

one statement amounting to misconduct is involved, our analysis includes a review of both the statements' individual and cumulative effect."[159]

Here, we found that two statements amount to prosecutorial misconduct; namely, the two instances when the prosecutor misstated the record by claiming Reyes referred to Deems as a "coked out crazy white bitch." In view of the evidence supporting Reyes's assault conviction involving Deems, we do not find that these statements, individually or cumulatively, affected the outcome of Reyes's trial.

First, we disagree with Reyes's contention that this was a close case because the jury "acquitted Reyes of numerous crimes for which [Deems] has provided theoretically adequate testimony" and that the verdict "reflects that they generally did not find her testimony adequate."[160] There is nothing in the record to suggest this. Most of the charges in this case had nothing to do with Deems or her credibility, rather, they were related solely to the circumstances surrounding Reyes's arrest.

Second, we find that the issues affected by the prosecutorial misconduct are not central to this case. Though it was undoubtedly unfortunate that the prosecution mischaracterized Reyes's testimony on two occasions, we do not believe that this explicitly speaks directly to whether Reyes intended to harm Deems. Accordingly,

---

[159] *Heald*, 251 A.3d at 652 (internal quotations and citation omitted).
[160] Opening Br. at 22.

Reyes has not shown that the trial judge plainly erred in not *sua sponte* finding that prosecutorial misconduct occurred.

> ### 3. *The Prosecutor's Statements Were Not Repetitive Errors that Require Reversal*

"If we conclude that the misconduct would not warrant reversal under the *Wainwright* standard, we proceed to apply our analysis in *Hunter v. State* as the third analytical step, and we consider whether the prosecutor's statements are repetitive errors that require reversal because they cast doubt on the integrity of the judicial process."[161] Such errors must occur over multiple trials.[162] Here, the prosecutorial misconduct was confined to statements made during the prosecution's closing argument at one trial and did not constitute repetitive errors over multiple trials that require reversal.

## IV. CONCLUSION

The amendment to Reyes's indictment was purely one of form. Accordingly, we AFFIRM Reyes's conviction and sentence for resisting arrest with force or violence. And although some of the prosecutor's statements made during the prosecution's closing statement were improper, we find no plain error under *Wainwright* nor repetitive error under *Hunter.* Accordingly, we AFFIRM Reyes's conviction and sentence for second-degree assault of Jennifer Deems.

---

[161] *Trala v. State*, 244 A.3d at 998 (citing *Baker*, 906 A.2d at 150) (footnote omitted).
[162] *Id.*

36